# PAYNE v. TENNESSEE

No. 90–5721.  Argued April 24, 1991—Decided June 27, 1991

*J. Brooke Lathram* argued the cause and filed briefs for petitioner.

*Charles W. Burson,* Attorney General of Tennessee, argued the cause for respondent. With him on the brief was *Kathy M. Principe,* Assistant Attorney General.

*Attorney General Thornburgh* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Starr, Assistant Attorney General Mueller, Deputy Solicitor General Bryson,* and *Stephen L. Nightingale.**

---

*\*Stephen B. Bright* and *J. L. Chestnut* filed a brief for the Southern Christian Leadership Conference as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the Criminal Justice Legal Foundation by *Kent S. Scheidegger;* for the Washington Legal Foundation et al. by *Richard K. Willard, Daniel J. Popeo, Paul D. Kamenar,* and *Richard Samp;* and for Congressman Thomas J. Bliley, Jr., et al. by *Michael J. Lockerby* and *Frank G. Carrington.*

Briefs of *amici curiae* were filed for the State of Alabama et al. by *Daniel E. Lungren,* Attorney General of California, *George Williamson,* Chief Assistant Attorney General, *Harley D. Mayfield,* Senior Assistant Attorney General, *Frederick R. Millar, Jr.,* Supervising Deputy Attorney General, and *Louis R. Hanoian,* Deputy Attorney General, *James H. Evans,* Attorney General of Alabama, *Grant Woods,* Attorney General of Arizona,

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

In this case we reconsider our holdings in *Booth* v. *Maryland*, 482 U. S. 496 (1987), and *South Carolina* v. *Gathers*, 490 U. S. 805 (1989), that the Eighth Amendment bars the admission of victim impact evidence during the penalty phase of a capital trial.

Petitioner, Pervis Tyrone Payne, was convicted by a jury on two counts of first-degree murder and one count of assault with intent to commit murder in the first degree. He was sentenced to death for each of the murders and to 30 years in prison for the assault.

The victims of Payne's offenses were 28-year-old Charisse Christopher, her 2-year-old daughter Lacie, and her 3-year-old son Nicholas. The three lived together in an apartment in Millington, Tennessee, across the hall from Payne's girl-friend, Bobbie Thomas. On Saturday, June 27, 1987, Payne visited Thomas' apartment several times in expectation of her return from her mother's house in Arkansas, but found no one at home. On one visit, he left his overnight bag, con-

*Gale A. Norton,* Attorney General of Colorado, *John J. Kelly,* Chief State's Attorney of Connecticut, *Robert A. Butterworth,* Attorney General of Florida, *Linley E. Pearson,* Attorney General of Indiana, *Frederic J. Cowan,* Attorney General of Kentucky, *J. Joseph Curran, Jr.,* Attorney General of Maryland, *Mike Moore,* Attorney General of Mississippi, *William L. Webster,* Attorney General of Missouri, *Marc Racicot,* Attorney General of Montana, *Don Stenberg,* Attorney General of Nebraska, *Frankie Sue Del Papa,* Attorney General of Nevada, *Robert J. Del Tufo,* Attorney General of New Jersey, *Lacy H. Thornburg,* Attorney General of North Carolina, *Lee Fisher,* Attorney General of Ohio, *Dave Frohnmayer,* Attorney General of Oregon, *Ernest D. Preate, Jr.,* Attorney General of Pennsylvania, *T. Travis Medlock,* Attorney General of South Carolina, *Mark W. Barnett,* Attorney General of South Dakota, and *Kenneth O. Eikenberry,* Attorney General of Washington; for the Appellate Committee of the California District Attorneys Association by *Ira Reiner, Harry B. Sondheim,* and *Martha E. Bellinger;* for the Justice for All Political Committee et al. by *Mario Thomas Gaboury* and *Sally S. King;* and for the National Organization for Victim Assistance et al. by *Judith Rowland.*

taining clothes and other items for his weekend stay, in the hallway outside Thomas' apartment. With the bag were three cans of malt liquor.

Payne passed the morning and early afternoon injecting cocaine and drinking beer. Later, he drove around the town with a friend in the friend's car, each of them taking turns reading a pornographic magazine. Sometime around 3 p.m., Payne returned to the apartment complex, entered the Christophers' apartment, and began making sexual advances towards Charisse. Charisse resisted and Payne became violent. A neighbor who resided in the apartment directly beneath the Christophers heard Charisse screaming, "'Get out, get out,' as if she were telling the children to leave." Brief for Respondent 3. The noise briefly subsided and then began, "'horribly loud.'" *Ibid.* The neighbor called the police after she heard a "blood curdling scream" from the Christophers' apartment. *Ibid.*

When the first police officer arrived at the scene, he immediately encountered Payne, who was leaving the apartment building, so covered with blood that he appeared to be "'sweating blood.'" The officer confronted Payne, who responded, "'I'm the complainant.'" *Id.*, at 3–4. When the officer asked, "'What's going on up there?'" Payne struck the officer with the overnight bag, dropped his tennis shoes, and fled. 791 S. W. 2d 10, 12 (Tenn. 1990).

Inside the apartment, the police encountered a horrifying scene. Blood covered the walls and floor throughout the unit. Charisse and her children were lying on the floor in the kitchen. Nicholas, despite several wounds inflicted by a butcher knife that completely penetrated through his body from front to back, was still breathing. Miraculously, he survived, but not until after undergoing seven hours of surgery and a transfusion of 1,700 cc's of blood—400 to 500 cc's more than his estimated normal blood volume. Charisse and Lacie were dead.

Charisse's body was found on the kitchen floor on her back, her legs fully extended. She had sustained 42 direct knife wounds and 42 defensive wounds on her arms and hands. The wounds were caused by 41 separate thrusts of a butcher knife. None of the 84 wounds inflicted by Payne were individually fatal; rather, the cause of death was most likely bleeding from all of the wounds.

Lacie's body was on the kitchen floor near her mother. She had suffered stab wounds to the chest, abdomen, back, and head. The murder weapon, a butcher knife, was found at her feet. Payne's baseball cap was snapped on her arm near her elbow. Three cans of malt liquor bearing Payne's fingerprints were found on a table near her body, and a fourth empty one was on the landing outside the apartment door.

Payne was apprehended later that day hiding in the attic of the home of a former girlfriend. As he descended the stairs of the attic, he stated to the arresting officers, "'Man, I ain't killed no woman.'" *Id.*, at 13. According to one of the officers, Payne had "'a wild look about him. His pupils were contracted. He was foaming at the mouth, saliva. He appeared to be very nervous. He was breathing real rapid.'" *Ibid.* He had blood on his body and clothes and several scratches across his chest. It was later determined that the blood stains matched the victims' blood types. A search of his pockets revealed a packet containing cocaine residue, a hypodermic syringe wrapper, and a cap from a hypodermic syringe. His overnight bag, containing a bloody white shirt, was found in a nearby dumpster.

At trial, Payne took the stand and, despite the overwhelming and relatively uncontroverted evidence against him, testified that he had not harmed any of the Christophers. Rather, he asserted that another man had raced by him as he was walking up the stairs to the floor where the Christophers lived. He stated that he had gotten blood on himself when, after hearing moans from the Christophers' apartment, he

had tried to help the victims. According to his testimony, he panicked and fled when he heard police sirens and noticed the blood on his clothes. The jury returned guilty verdicts against Payne on all counts.

During the sentencing phase of the trial, Payne presented the testimony of four witnesses: his mother and father, Bobbie Thomas, and Dr. John T. Hutson, a clinical psychologist specializing in criminal court evaluation work. Bobbie Thomas testified that she met Payne at church, during a time when she was being abused by her husband. She stated that Payne was a very caring person, and that he devoted much time and attention to her three children, who were being affected by her marital difficulties. She said that the children had come to love him very much and would miss him, and that he "behaved just like a father that loved his kids." She asserted that he did not drink, nor did he use drugs, and that it was generally inconsistent with Payne's character to have committed these crimes.

Dr. Hutson testified that based on Payne's low score on an IQ test, Payne was "mentally handicapped." Hutson also said that Payne was neither psychotic nor schizophrenic, and that Payne was the most polite prisoner he had ever met. Payne's parents testified that their son had no prior criminal record and had never been arrested. They also stated that Payne had no history of alcohol or drug abuse, he worked with his father as a painter, he was good with children, and he was a good son.

The State presented the testimony of Charisse's mother, Mary Zvolanek. When asked how Nicholas had been affected by the murders of his mother and sister, she responded:

> "He cries for his mom. He doesn't seem to understand why she doesn't come home. And he cries for his sister Lacie. He comes to me many times during the week and asks me, Grandmama, do you miss my Lacie. And I

tell him yes. He says, I'm worried about my Lacie." App. 3.

In arguing for the death penalty during closing argument, the prosecutor commented on the continuing effects of Nicholas' experience, stating:

"But we do know that Nicholas was alive. And Nicholas was in the same room. Nicholas was still conscious. His eyes were open. He responded to the paramedics. He was able to follow their directions. He was able to hold his intestines in as he was carried to the ambulance. So he knew what happened to his mother and baby sister." *Id.*, at 9.

"There is nothing you can do to ease the pain of any of the families involved in this case. There is nothing you can do to ease the pain of Bernice or Carl Payne, and that's a tragedy. There is nothing you can do basically to ease the pain of Mr. and Mrs. Zvolanek, and that's a tragedy. They will have to live with it the rest of their lives. There is obviously nothing you can do for Charisse and Lacie Jo. But there is something that you can do for Nicholas.

"Somewhere down the road Nicholas is going to grow up, hopefully. He's going to want to know what happened. And he is going to know what happened to his baby sister and his mother. He is going to want to know what type of justice was done. He is going to want to know what happened. With your verdict, you will provide the answer." *Id.*, at 12.

In the rebuttal to Payne's closing argument, the prosecutor stated:

"You saw the videotape this morning. You saw what Nicholas Christopher will carry in his mind forever. When you talk about cruel, when you talk about atrocious, and when you talk about heinous, that picture will

always come into your mind, probably throughout the rest of your lives. . . .

    .        .        .        .        .

". . . No one will ever know about Lacie Jo because she never had the chance to grow up. Her life was taken from her at the age of two years old. So, no there won't be a high school principal to talk about Lacie Jo Christopher, and there won't be anybody to take her to her high school prom. And there won't be anybody there—there won't be her mother there or Nicholas' mother there to kiss him at night. His mother will never kiss him good night or pat him as he goes off to bed, or hold him and sing him a lullaby.

    .        .        .        .        .

"[Petitioner's attorney] wants you to think about a good reputation, people who love the defendant and things about him. He doesn't want you to think about the people who love Charisse Christopher, her mother and daddy who loved her. The people who loved little Lacie Jo, the grandparents who are still here. The brother who mourns for her every single day and wants to know where his best little playmate is. He doesn't have anybody to watch cartoons with him, a little one. These are the things that go into why it is especially cruel, heinous, and atrocious, the burden that that child will carry forever." *Id.*, at 13–15.

The jury sentenced Payne to death on each of the murder counts.

The Supreme Court of Tennessee affirmed the conviction and sentence. 791 S. W. 2d 10 (1990). The court rejected Payne's contention that the admission of the grandmother's testimony and the State's closing argument constituted prejudicial violations of his rights under the Eighth Amendment as applied in *Booth* v. *Maryland*, 482 U. S. 496 (1987), and *South Carolina* v. *Gathers*, 490 U. S. 805 (1989). The court characterized the grandmother's testimony as "technically ir-

relevant," but concluded that it "did not create a constitutionally unacceptable risk of an arbitrary imposition of the death penalty and was harmless beyond a reasonable doubt." 791 S. W. 2d, at 18.

The court determined that the prosecutor's comments during closing argument were "relevant to [Payne's] personal responsibility and moral guilt." *Id.*, at 19. The court explained that "[w]hen a person deliberately picks a butcher knife out of a kitchen drawer and proceeds to stab to death a twenty-eight-year-old mother, her two and one-half year old daughter and her three and one-half year old son, in the same room, the physical and mental condition of the boy he left for dead is surely relevant in determining his 'blameworthiness.'" The court concluded that any violation of Payne's rights under *Booth* and *Gathers* "was harmless beyond a reasonable doubt." *Ibid.*

We granted certiorari, 498 U. S. 1080 (1991), to reconsider our holdings in *Booth* and *Gathers* that the Eighth Amendment prohibits a capital sentencing jury from considering "victim impact" evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family.

In *Booth*, the defendant robbed and murdered an elderly couple. As required by a state statute, a victim impact statement was prepared based on interviews with the victims' son, daughter, son-in-law, and granddaughter. The statement, which described the personal characteristics of the victims, the emotional impact of the crimes on the family, and set forth the family members' opinions and characterizations of the crimes and the defendant, was submitted to the jury at sentencing. The jury imposed the death penalty. The conviction and sentence were affirmed on appeal by the State's highest court.

This Court held by a 5-to-4 vote that the Eighth Amendment prohibits a jury from considering a victim impact statement at the sentencing phase of a capital trial. The Court

made clear that the admissibility of victim impact evidence was not to be determined on a case-by-case basis, but that such evidence was *per se* inadmissible in the sentencing phase of a capital case except to the extent that it "relate[d] directly to the circumstances of the crime." 482 U. S., at 507, n. 10. In *Gathers*, decided two years later, the Court extended the rule announced in *Booth* to statements made by a prosecutor to the sentencing jury regarding the personal qualities of the victim.

The *Booth* Court began its analysis with the observation that the capital defendant must be treated as a "'uniquely individual human bein[g],'" 482 U. S., at 504 (quoting *Woodson* v. *North Carolina*, 428 U. S. 280, 304 (1976)), and therefore the Constitution requires the jury to make an individualized determination as to whether the defendant should be executed based on the "'character of the individual and the circumstances of the crime.'" 482 U. S., at 502 (quoting *Zant* v. *Stephens*, 462 U. S. 862, 879 (1983)). The Court concluded that while no prior decision of this Court had mandated that only the defendant's character and immediate characteristics of the crime may constitutionally be considered, other factors are irrelevant to the capital sentencing decision unless they have "some bearing on the defendant's 'personal responsibility and moral guilt.'" 482 U. S., at 502 (quoting *Enmund* v. *Florida*, 458 U. S. 782, 801 (1982)). To the extent that victim impact evidence presents "factors about which the defendant was unaware, and that were irrelevant to the decision to kill," the Court concluded, it has nothing to do with the "blameworthiness of a particular defendant." 482 U. S., at 504, 505. Evidence of the victim's character, the Court observed, "could well distract the sentencing jury from its constitutionally required task [of] determining whether the death penalty is appropriate in light of the background and record of the accused and the particular circumstances of the crime." The Court concluded that, except to the extent that victim impact evidence relates "di-

rectly to the circumstances of the crime," *id.*, at 507, and n. 10, the prosecution may not introduce such evidence at a capital sentencing hearing because "it creates an impermissible risk that the capital sentencing decision will be made in an arbitrary manner," *id.*, at 505.

*Booth* and *Gathers* were based on two premises: that evidence relating to a particular victim or to the harm that a capital defendant causes a victim's family do not in general reflect on the defendant's "blameworthiness," and that only evidence relating to "blameworthiness" is relevant to the capital sentencing decision. However, the assessment of harm caused by the defendant as a result of the crime charged has understandably been an important concern of the criminal law, both in determining the elements of the offense and in determining the appropriate punishment. Thus, two equally blameworthy criminal defendants may be guilty of different offenses solely because their acts cause differing amounts of harm. "If a bank robber aims his gun at a guard, pulls the trigger, and kills his target, he may be put to death. If the gun unexpectedly misfires, he may not. His moral guilt in both cases is identical, but his responsibility in the former is greater." *Booth*, 482 U. S., at 519 (SCALIA, J., dissenting). The same is true with respect to two defendants, each of whom participates in a robbery, and each of whom acts with reckless disregard for human life; if the robbery in which the first defendant participated results in the death of a victim, he may be subjected to the death penalty, but if the robbery in which the second defendant participates does not result in the death of a victim, the death penalty may not be imposed. *Tison* v. *Arizona*, 481 U. S. 137, 148 (1987).

The principles which have guided criminal sentencing—as opposed to criminal liability—have varied with the times. The book of Exodus prescribes the *Lex talionis*, "An eye for an eye, a tooth for a tooth." Exodus 21: 22–23. In England and on the continent of Europe, as recently as the 18th century, crimes which would be regarded as quite minor today

were capital offenses. Writing in the 18th century, the Italian criminologist Cesare Beccaria advocated the idea that "the punishment should fit the crime." He said that "[w]e have seen that the true measure of crimes is the injury done to society." J. Farrer, Crimes and Punishments 199 (1880).

Gradually the list of crimes punishable by death diminished, and legislatures began grading the severity of crimes in accordance with the harm done by the criminal. The sentence for a given offense, rather than being precisely fixed by the legislature, was prescribed in terms of a minimum and a maximum, with the actual sentence to be decided by the judge. With the increasing importance of probation, as opposed to imprisonment, as a part of the penological process, some States such as California developed the "indeterminate sentence," where the time of incarceration was left almost entirely to the penological authorities rather than to the courts. But more recently the pendulum has swung back. The Federal Sentencing Guidelines, which went into effect in 1987, provided for very precise calibration of sentences, depending upon a number of factors. These factors relate both to the subjective guilt of the defendant and to the harm caused by his acts.

Wherever judges in recent years have had discretion to impose sentence, the consideration of the harm caused by the crime has been an important factor in the exercise of that discretion:

> "The first significance of harm in Anglo-American jurisprudence is, then, as a prerequisite to the criminal sanction. The second significance of harm—one no less important to judges—is as a measure of the seriousness of the offense and therefore as a standard for determining the severity of the sentence that will be meted out." S. Wheeler, K. Mann, & A. Sarat, Sitting in Judgment: The Sentencing of White-Collar Criminals 56 (1988).

Whatever the prevailing sentencing philosophy, the sentencing authority has always been free to consider a wide range of

relevant material. *Williams* v. *New York*, 337 U. S. 241 (1949). In the federal system, we observed that "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States* v. *Tucker*, 404 U. S. 443, 446 (1972). Even in the context of capital sentencing, prior to *Booth* the joint opinion of Justices Stewart, Powell, and STEVENS in *Gregg* v. *Georgia*, 428 U. S. 153, 203–204 (1976), had rejected petitioner's attack on the Georgia statute because of the "wide scope of evidence and argument allowed at presentence hearings." The joint opinion stated:

> "We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument. . . . So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision."

The Maryland statute involved in *Booth* required that the presentence report in all felony cases include a "victim impact statement" which would describe the effect of the crime on the victim and his family. *Booth*, *supra*, at 498. Congress and most of the States have, in recent years, enacted similar legislation to enable the sentencing authority to consider information about the harm caused by the crime committed by the defendant. The evidence involved in the present case was not admitted pursuant to any such enactment, but its purpose and effect were much the same as if it had been. While the admission of this particular kind of evidence—designed to portray for the sentencing authority the actual harm caused by a particular crime—is of recent origin, this fact hardly renders it unconstitutional. *Williams* v. *Florida*, 399 U. S. 78 (1970) (upholding the constitutionality of a

notice-of-alibi statute, of a kind enacted by at least 15 States dating from 1927); *United States* v. *DiFrancesco*, 449 U. S. 117, 142 (1980) (upholding against a double jeopardy challenge an Act of Congress representing "a considered legislative attempt to attack a specific problem in our criminal justice system, that is, the tendency on the part of some trial judges 'to mete out light sentences in cases involving organized crime management personnel'").

We have held that a State cannot preclude the sentencer from considering "any relevant mitigating evidence" that the defendant proffers in support of a sentence less than death. *Eddings* v. *Oklahoma*, 455 U. S. 104, 114 (1982). See also *Skipper* v. *South Carolina*, 476 U. S. 1 (1986). Thus we have, as the Court observed in *Booth*, required that the capital defendant be treated as a "'uniquely individual human bein[g],'" 482 U. S., at 504 (quoting *Woodson* v. *North Carolina*, 428 U. S., at 304). But it was never held or even suggested in any of our cases preceding *Booth* that the defendant, entitled as he was to individualized consideration, was to receive that consideration wholly apart from the crime which he had committed. The language quoted from *Woodson* in the *Booth* opinion was not intended to describe a class of evidence that *could not* be received, but a class of evidence which *must* be received. Any doubt on the matter is dispelled by comparing the language in *Woodson* with the language from *Gregg* v. *Georgia*, quoted above, which was handed down the same day as *Woodson*. This misreading of precedent in *Booth* has, we think, unfairly weighted the scales in a capital trial; while virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances, the State is barred from either offering "a quick glimpse of the life" which a defendant "chose to extinguish," *Mills* v. *Maryland*, 486 U. S. 367, 397 (1988) (REHNQUIST, C. J., dissenting), or demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide.

The *Booth* Court reasoned that victim impact evidence must be excluded because it would be difficult, if not impossible, for the defendant to rebut such evidence without shifting the focus of the sentencing hearing away from the defendant, thus creating a "'mini-trial' on the victim's character." *Booth, supra,* at 506–507. In many cases the evidence relating to the victim is already before the jury at least in part because of its relevance at the guilt phase of the trial. But even as to additional evidence admitted at the sentencing phase, the mere fact that for tactical reasons it might not be prudent for the defense to rebut victim impact evidence makes the case no different than others in which a party is faced with this sort of a dilemma. As we explained in rejecting the contention that expert testimony on future dangerousness should be excluded from capital trials, "the rules of evidence generally extant at the federal and state levels anticipate that relevant, unprivileged evidence should be admitted and its weight left to the factfinder, who would have the benefit of cross-examination and contrary evidence by the opposing party." *Barefoot* v. *Estelle,* 463 U. S. 880, 898 (1983).

Payne echoes the concern voiced in *Booth*'s case that the admission of victim impact evidence permits a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy. *Booth, supra,* at 506, n. 8. As a general matter, however, victim impact evidence is not offered to encourage comparative judgments of this kind—for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead *each* victim's "uniqueness as an individual human being," whatever the jury might think the loss to the community resulting from his death might be. The facts of *Gathers* are an excellent illustration of this: The evidence showed that the victim was an out of work, mentally handicapped individual, per-

haps not, in the eyes of most, a significant contributor to society, but nonetheless a murdered human being.

Under our constitutional system, the primary responsibility for defining crimes against state law, fixing punishments for the commission of these crimes, and establishing procedures for criminal trials rests with the States. The state laws respecting crimes, punishments, and criminal procedure are, of course, subject to the overriding provisions of the United States Constitution. Where the State imposes the death penalty for a particular crime, we have held that the Eighth Amendment imposes special limitations upon that process.

> "First, there is a required threshold below which the death penalty cannot be imposed. In this context, the State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold. Moreover, a societal consensus that the death penalty is disproportionate to a particular offense prevents a State from imposing the death penalty for that offense. Second, States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, the State cannot challenge the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant." *McCleskey* v. *Kemp*, 481 U. S. 279, 305–306 (1987).

But, as we noted in *California* v. *Ramos*, 463 U. S. 992, 1001 (1983), "[b]eyond these limitations . . . the Court has deferred to the State's choice of substantive factors relevant to the penalty determination."

"Within the constitutional limitations defined by our cases, the States enjoy their traditional latitude to prescribe the method by which those who commit murder shall be punished." *Blystone* v. *Pennsylvania*, 494 U. S. 299, 309 (1990). The States remain free, in capital cases, as well as others, to

devise new procedures and new remedies to meet felt needs. Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities. We think the *Booth* Court was wrong in stating that this kind of evidence leads to the arbitrary imposition of the death penalty. In the majority of cases, and in this case, victim impact evidence serves entirely legitimate purposes. In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief. See *Darden* v. *Wainwright*, 477 U. S. 168, 179–183 (1986). Courts have always taken into consideration the harm done by the defendant in imposing sentence, and the evidence adduced in this case was illustrative of the harm caused by Payne's double murder.

We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Booth*, 482 U. S., at 517 (WHITE, J., dissenting) (citation omitted). By turning the victim into a "faceless stranger at the penalty phase of a capital trial," *Gathers*, 490 U. S., at 821 (O'CONNOR, J., dissenting), *Booth* deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.

The present case is an example of the potential for such unfairness. The capital sentencing jury heard testimony from

Payne's girlfriend that they met at church; that he was affectionate, caring, and kind to her children; that he was not an abuser of drugs or alcohol; and that it was inconsistent with his character to have committed the murders. Payne's parents testified that he was a good son, and a clinical psychologist testified that Payne was an extremely polite prisoner and suffered from a low IQ. None of this testimony was related to the circumstances of Payne's brutal crimes. In contrast, the only evidence of the impact of Payne's offenses during the sentencing phase was Nicholas' grandmother's description—in response to a single question—that the child misses his mother and baby sister. Payne argues that the Eighth Amendment commands that the jury's death sentence must be set aside because the jury heard this testimony. But the testimony illustrated quite poignantly some of the harm that Payne's killing had caused; there is nothing unfair about allowing the jury to bear in mind that harm at the same time as it considers the mitigating evidence introduced by the defendant. The Supreme Court of Tennessee in this case obviously felt the unfairness of the rule pronounced by *Booth* when it said: "It is an affront to the civilized members of the human race to say that at sentencing in a capital case, a parade of witnesses may praise the background, character and good deeds of Defendant (as was done in this case), without limitation as to relevancy, but nothing may be said that bears upon the character of, or the harm imposed, upon the victims." 791 S. W. 2d, at 19.

In *Gathers*, as indicated above, we extended the holding of *Booth* barring victim impact evidence to the prosecutor's argument to the jury. Human nature being what it is, capable lawyers trying cases to juries try to convey to the jurors that the people involved in the underlying events are, or were, living human beings, with something to be gained or lost from the jury's verdict. Under the aegis of the Eighth Amendment, we have given the broadest latitude to the defendant to introduce relevant mitigating evidence reflecting

on his individual personality, and the defendant's attorney may argue that evidence to the jury. Petitioner's attorney in this case did just that. For the reasons discussed above, we now reject the view—expressed in *Gathers*—that a State may not permit the prosecutor to similarly argue to the jury the human cost of the crime of which the defendant stands convicted. We reaffirm the view expressed by Justice Cardozo in *Snyder* v. *Massachusetts*, 291 U. S. 97, 122 (1934): "[J]ustice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true."

We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

Payne and his *amicus* argue that despite these numerous infirmities in the rule created by *Booth* and *Gathers*, we should adhere to the doctrine of *stare decisis* and stop short of overruling those cases. *Stare decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process. See *Vasquez* v. *Hillery*, 474 U. S. 254, 265–266 (1986). Adhering to precedent "is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than it be settled right." *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406 (1932) (Brandeis, J., dissenting). Nevertheless, when governing decisions are unworkable or are badly reasoned, "this Court has never felt constrained to follow precedent." *Smith* v. *Allwright*, 321 U. S. 649, 665 (1944).

*Stare decisis* is not an inexorable command; rather, it "is a principle of policy and not a mechanical formula of adherence to the latest decision." *Helvering* v. *Hallock,* 309 U. S. 106, 119 (1940). This is particularly true in constitutional cases, because in such cases "correction through legislative action is practically impossible." *Burnet* v. *Coronado Oil & Gas Co.,* *supra,* at 407 (Brandeis, J., dissenting). Considerations in favor of *stare decisis* are at their acme in cases involving property and contract rights, where reliance interests are involved, see *Swift & Co.* v. *Wickham,* 382 U. S. 111, 116 (1965); *Oregon ex rel. State Land Bd.* v. *Corvallis Sand & Gravel Co.,* 429 U. S. 363 (1977); *Burnet* v. *Coronado Oil & Gas Co.,* *supra,* at 405–411 (Brandeis, J., dissenting); *United States* v. *Title Ins. & Trust Co.,* 265 U. S. 472 (1924); *The Genesee Chief* v. *Fitzhugh,* 12 How. 443, 458 (1852); the opposite is true in cases such as the present one involving procedural and evidentiary rules.

Applying these general principles, the Court has during the past 20 Terms overruled in whole or in part 33 of its previous constitutional decisions.[1] *Booth* and *Gathers* were de-

---

[1] *Perez* v. *Campbell,* 402 U. S. 637 (1971) (overruling *Kesler* v. *Department of Public Safety of Utah,* 369 U. S. 153 (1962)); *Dunn* v. *Blumstein,* 405 U. S. 330 (1972) (overruling *Pope* v. *Williams,* 193 U. S. 621 (1904)); *Lehnhausen* v. *Lake Shore Auto Parts Co.,* 410 U. S. 356 (1973) (overruling *Quaker City Cab Co.* v. *Pennsylvania,* 277 U. S. 389 (1928)); *Miller* v. *California,* 413 U. S. 15 (1973) (overruling *Book Named "John Cleland's Memoirs of a Woman of Pleasure"* v. *Attorney General of Mass.,* 383 U. S. 413 (1966)); *North Dakota Pharmacy Bd.* v. *Snyder's Drug Stores, Inc.,* 414 U. S. 156 (1973) (overruling *Louis K. Liggett Co.* v. *Baldridge,* 278 U. S. 105 (1928)); *Edelman* v. *Jordan,* 415 U. S. 651 (1974) (overruling in part *Shapiro* v. *Thompson,* 394 U. S. 618 (1969); *State Dept. of Health & Rehabilitative Services of Florida* v. *Zarate,* 407 U. S. 918 (1972); and *Sterrett* v. *Mothers' & Children's Rights Organization,* 409 U. S. 809 (1972)); *Taylor* v. *Louisiana,* 419 U. S. 522 (1975) (overruling in effect *Hoyt* v. *Florida,* 368 U. S. 57 (1961)); *Michelin Tire Corp.* v. *Wages,* 423 U. S. 276 (1976) (overruling *Low* v. *Austin,* 13 Wall. 29 (1872)); *Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748 (1976) (overruling *Valentine* v. *Chrestensen,* 316 U. S. 52

cided by the narrowest of margins, over spirited dissents challenging the basic underpinnings of those decisions. They have been questioned by Members of the Court in later

(1942)); *National League of Cities* v. *Usery*, 426 U. S. 833 (1976) (overruling *Maryland* v. *Wirtz*, 392 U. S. 183 (1968)); *New Orleans* v. *Dukes*, 427 U. S. 297 (1976) (overruling *Morey* v. *Doud*, 354 U. S. 457 (1957)); *Craig* v. *Boren*, 429 U. S. 190 (1976) (overruling *Goesaert* v. *Cleary*, 335 U. S. 464 (1948)); *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274 (1977) (overruling *Spector Motor Service, Inc.* v. *O'Connor*, 340 U. S. 602 (1951)); *Shaffer* v. *Heitner*, 433 U. S. 186 (1977) (overruling *Pennoyer* v. *Neff*, 95 U. S. 714 (1878)); *Department of Revenue of Washington* v. *Association of Washington Stevedoring Cos.*, 435 U. S. 734 (1978) (overruling *Puget Sound Stevedoring Co.* v. *State Tax Comm'n*, 302 U. S. 90 (1937)); *United States* v. *Scott*, 437 U. S. 82 (1978) (overruling *United States* v. *Jenkins*, 420 U. S. 358 (1975)); *Hughes* v. *Oklahoma*, 441 U. S. 322 (1979) (overruling *Geer* v. *Connecticut*, 161 U. S. 519 (1896)); *United States* v. *Salvucci*, 448 U. S. 83 (1980) (overruling *Jones* v. *United States*, 362 U. S. 257 (1960)); *Commonwealth Edison Co.* v. *Montana*, 453 U. S. 609 (1981) (overruling *Heisler* v. *Thomas Colliery Co.*, 260 U. S. 245 (1922)); *Illinois* v. *Gates*, 462 U. S. 213 (1983) (overruling *Aguilar* v. *Texas*, 378 U. S. 108 (1964)); *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89 (1984) (overruling in part *Rolston* v. *Missouri Fund Comm'rs*, 120 U. S. 390 (1887)); *United States* v. *One Assortment of 89 Firearms*, 465 U. S. 354 (1984) (overruling *Coffey* v. *United States*, 116 U. S. 436 (1886)); *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528 (1985) (overruling *National League of Cities* v. *Usery, supra*); *United States* v. *Miller*, 471 U. S. 130 (1985) (overruling in part *Ex parte Bain*, 121 U. S. 1 (1887)); *Daniels* v. *Williams*, 474 U. S. 327 (1986) (overruling in part *Parratt* v. *Taylor*, 451 U. S. 527 (1981)); *Batson* v. *Kentucky*, 476 U. S. 79 (1986) (overruling in part *Swain* v. *Alabama*, 380 U. S. 202 (1965)); *Solorio* v. *United States*, 483 U. S. 435 (1987) (overruling *O'Callahan* v. *Parker*, 395 U. S. 258 (1969)); *Welch* v. *Texas Dept. of Highways and Public Transportation*, 483 U. S. 468 (1987) (overruling in part *Parden* v. *Terminal Railway of Alabama Docks Dept.*, 377 U. S. 184 (1964)); *South Carolina* v. *Baker*, 485 U. S. 505 (1988) (overruling *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429 (1895)); *Thornburgh* v. *Abbott*, 490 U. S. 401 (1989) (overruling in part *Procunier* v. *Martinez*, 416 U. S. 396 (1974)); *Alabama* v. *Smith*, 490 U. S. 794 (1989) (overruling *Simpson* v. *Rice* (decided with *North Carolina* v. *Pearce*), 395 U. S. 711 (1969)); *Healy* v. *Beer Institute*, 491 U. S. 324 (1989) (overruling *Joseph E. Seagram & Sons, Inc.* v. *Hostetter*, 384 U. S. 35 (1966)); *Collins* v. *Youngblood*, 497 U. S. 37 (1990)

decisions and have defied consistent application by the lower courts. See *Gathers*, 490 U. S., at 813 (O'CONNOR, J., dissenting); *Mills* v. *Maryland*, 486 U. S., at 395–396 (REHNQUIST, C. J., dissenting). See also *State* v. *Huertas*, 51 Ohio St. 3d 22, 33, 553 N. E. 2d 1058, 1070 (1990) ("The fact that the majority and two dissenters in this case all interpret the opinions and footnotes in *Booth* and *Gathers* differently demonstrates the uncertainty of the law in this area") (Moyer, C. J., concurring). Reconsidering these decisions now, we conclude, for the reasons heretofore stated, that they were wrongly decided and should be, and now are, overruled.[2] We accordingly affirm the judgment of the Supreme Court of Tennessee.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE WHITE and JUSTICE KENNEDY join, concurring.

In my view, a State may legitimately determine that victim impact evidence is relevant to a capital sentencing proceeding. A State may decide that the jury, before determining whether a convicted murderer should receive the death penalty, should know the full extent of the harm caused by the crime, including its impact on the victim's family and community. A State may decide also that the jury should see "a quick glimpse of the life petitioner chose to extinguish," *Mills* v. *Maryland*, 486 U. S. 367, 397 (1988) (REHN-

---

(overruling *Kring* v. *Missouri*, 107 U. S. 221 (1883); *Thompson* v. *Utah*, 170 U. S. 343 (1898)); *California* v. *Acevedo*, 500 U. S. 565 (1991) (overruling *Arkansas* v. *Sanders*, 442 U. S. 753 (1979)).

[2] Our holding today is limited to the holdings of *Booth* v. *Maryland*, 482 U. S. 496 (1987), and *South Carolina* v. *Gathers*, 490 U. S. 805 (1989), that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing. *Booth* also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment. No evidence of the latter sort was presented at the trial in this case.

QUIST, C. J., dissenting), to remind the jury that the person whose life was taken was a unique human being.

Given that victim impact evidence is potentially relevant, nothing in the Eighth Amendment commands that States treat it differently than other kinds of relevant evidence. "The Eighth Amendment stands as a shield against those practices and punishments which are either inherently cruel or which so offend the moral consensus of this society as to be deemed 'cruel and unusual.'" *South Carolina* v. *Gathers*, 490 U. S. 805, 821 (1989) (O'CONNOR, J., dissenting). Certainly there is no strong societal consensus that a jury may not take into account the loss suffered by a victim's family or that a murder victim must remain a faceless stranger at the penalty phase of a capital trial. Just the opposite is true. Most States have enacted legislation enabling judges and juries to consider victim impact evidence. *Ante*, at 821. The possibility that this evidence may in some cases be unduly inflammatory does not justify a prophylactic, constitutionally based rule that this evidence may never be admitted. Trial courts routinely exclude evidence that is unduly inflammatory; where inflammatory evidence is improperly admitted, appellate courts carefully review the record to determine whether the error was prejudicial.

We do not hold today that victim impact evidence must be admitted, or even that it should be admitted. We hold merely that if a State decides to permit consideration of this evidence, "the Eighth Amendment erects no *per se* bar." *Ante*, at 827. If, in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause of the Fourteenth Amendment.

That line was not crossed in this case. The State called as a witness Mary Zvolanek, Nicholas' grandmother. Her testimony was brief. She explained that Nicholas cried for his mother and baby sister and could not understand why they

did not come home. I do not doubt that the jurors were moved by this testimony—who would not have been? But surely this brief statement did not inflame their passions more than did the facts of the crime: Charisse Christopher was stabbed 41 times with a butcher knife and bled to death; her 2-year-old daughter Lacie was killed by repeated thrusts of that same knife; and 3-year-old Nicholas, despite stab wounds that penetrated completely through his body from front to back, survived—only to witness the brutal murders of his mother and baby sister. In light of the jury's unavoidable familiarity with the facts of Payne's vicious attack, I cannot conclude that the additional information provided by Mary Zvolanek's testimony deprived petitioner of due process.

Nor did the prosecutor's comments about Charisse and Lacie in the closing argument violate the Constitution. The jury had earlier seen a videotape of the murder scene that included the slashed and bloody corpses of Charisse and Lacie. In arguing that Payne deserved the death penalty, the prosecutor sought to remind the jury that Charisse and Lacie were more than just lifeless bodies on a videotape, that they were unique human beings. The prosecutor remarked that Charisse would never again sing a lullaby to her son and that Lacie would never attend a high school prom. In my view, these statements were permissible. "Murder is the ultimate act of depersonalization." Brief for Justice For All Political Committee et al. as *Amici Curiae* 3. It transforms a living person with hopes, dreams, and fears into a corpse, thereby taking away all that is special and unique about the person. The Constitution does not preclude a State from deciding to give some of that back.

I agree with the Court that *Booth* v. *Maryland*, 482 U. S. 496 (1987), and *Gathers, supra*, were wrongly decided. The Eighth Amendment does not prohibit a State from choosing to admit evidence concerning a murder victim's personal characteristics or the impact of the crime on the victim's fam-

ily and community. *Booth* also addressed another kind of victim impact evidence—opinions of the victim's family about the crime, the defendant, and the appropriate sentence. As the Court notes in today's decision, we do not reach this issue as no evidence of this kind was introduced at petitioner's trial. *Ante*, at 830, n. 2. Nor do we express an opinion as to other aspects of the prosecutor's conduct. As to the victim impact evidence that was introduced, its admission did not violate the Constitution. Accordingly, I join the Court's opinion.

JUSTICE SCALIA, with whom JUSTICE O'CONNOR and JUSTICE KENNEDY join as to Part II, concurring.

## I

The Court correctly observes the injustice of requiring the exclusion of relevant aggravating evidence during capital sentencing, while requiring the admission of all relevant mitigating evidence, see, *e. g., Eddings* v. *Oklahoma*, 455 U. S. 104 (1982); *Lockett* v. *Ohio*, 438 U. S. 586 (1978) (plurality opinion). I have previously expressed my belief that the latter requirement is both wrong and, when combined with the remainder of our capital sentencing jurisprudence, unworkable. See *Walton* v. *Arizona*, 497 U. S. 639, 671–673 (1990) (opinion concurring in part and concurring in judgment). Even if it were abandoned, however, I would still affirm the judgment here. True enough, the Eighth Amendment permits parity between mitigating and aggravating factors. But more broadly and fundamentally still, it permits the People to decide (within the limits of other constitutional guarantees) what is a crime and what constitutes aggravation and mitigation of a crime.

## II

The response to JUSTICE MARSHALL's strenuous defense of the virtues of *stare decisis* can be found in the writings of JUSTICE MARSHALL himself. That doctrine, he has re-

minded us, "is not 'an imprisonment of reason.'" *Guardians Assn.* v. *Civil Service Comm'n of New York City,* 463 U. S. 582, 618 (1983) (dissenting opinion) (quoting *United States* v. *International Boxing Club of N. Y., Inc.,* 348 U. S. 236, 249 (1955) (Frankfurter, J., dissenting)). If there was ever a case that defied reason, it was *Booth* v. *Maryland,* 482 U. S. 496 (1987), imposing a constitutional rule that had absolutely no basis in constitutional text, in historical practice, or in logic. JUSTICE MARSHALL has also explained that "'[t]he jurist concerned with public confidence in, and acceptance of the judicial system might well consider that, however admirable its resolute adherence to the law as it was, a decision contrary to the public sense of justice as it is, operates, so far as it is known, to diminish respect for the courts and for law itself.'" *Flood* v. *Kuhn,* 407 U. S. 258, 293, n. 4 (1972) (dissenting opinion) (quoting Szanton, Stare Decisis; A Dissenting View, 10 Hastings L. J. 394, 397 (1959)) (internal quotation marks omitted). *Booth*'s stunning *ipse dixit,* that a crime's unanticipated consequences must be deemed "irrelevant" to the sentence, 482 U. S., at 503, conflicts with a public sense of justice keen enough that it has found voice in a nationwide "victims' rights" movement.

Today, however, JUSTICE MARSHALL demands of us some "special justification"—*beyond* the mere conviction that the rule of *Booth* significantly harms our criminal justice system and is egregiously wrong—before we can be absolved of exercising "[p]ower, not reason." *Post,* at 844. I do not think that is fair. In fact, quite to the contrary, what would enshrine power as the governing principle of this Court is the notion that an important constitutional decision with plainly inadequate rational support *must* be left in place for the sole reason that it once attracted five votes.

It seems to me difficult for those who were in the majority in *Booth* to hold themselves forth as ardent apostles of *stare decisis.* That doctrine, to the extent it rests upon anything more than administrative convenience, is merely the applica-

tion to judicial precedents of a more general principle that the settled practices and expectations of a democratic society should generally not be disturbed by the courts.   It is hard to have a genuine regard for *stare decisis* without honoring that more general principle as well.   A decision of this Court which, while not overruling a prior holding, nonetheless announces a novel rule, contrary to long and unchallenged practice, and pronounces it to be the Law of the Land—such a decision, no less than an explicit overruling, should be approached with great caution.   It was, I suggest, *Booth*, and not today's decision, that compromised the fundamental values underlying the doctrine of *stare decisis*.

JUSTICE SOUTER, with whom JUSTICE KENNEDY joins, concurring.

I join the Court's opinion addressing two categories of facts excluded from consideration at capital sentencing proceedings by *Booth* v. *Maryland*, 482 U. S. 496 (1987), and *South Carolina* v. *Gathers*, 490 U. S. 805 (1989): information revealing the individuality of the victim and the impact of the crime on the victim's survivors.[1]   As to these two categories, I believe *Booth* and *Gathers* were wrongly decided.

To my knowledge, our legal tradition has never included a general rule that evidence of a crime's effects on the victim and others is, standing alone, irrelevant to a sentencing determination of the defendant's culpability.   Indeed, as the Court's opinion today, see *ante*, at 819–821, and dissents in *Booth, supra*, at 519–520 (opinion of SCALIA, J.) and *Gathers, supra*, at 817–820 (opinion of O'CONNOR, J.), make clear, criminal conduct has traditionally been categorized and penalized differently according to consequences not specifically

---

[1] This case presents no challenge to the Court's holding in *Booth* v. *Maryland* that a sentencing authority should not receive a third category of information concerning a victim's family members' characterization of and opinions about the crime, the defendant, and the appropriate sentence. See *ante*, at 830, n. 2.

intended, but determined in part by conditions unknown to a defendant when he acted. The majority opinion in *Booth, supra,* at 502–503, nonetheless characterized the consideration in a capital sentencing proceeding of a victim's individuality and the consequences of his death on his survivors as "irrelevant" and productive of "arbitrary and capricious" results, insofar as that would allow the sentencing authority to take account of information not specifically contemplated by the defendant prior to his ultimate criminal decision. This condemnation comprehends two quite separate elements. As to one such element, the condemnation is merited but insufficient to justify the rule in *Booth,* and as to the other it is mistaken.

Evidence about the victim and survivors, and any jury argument predicated on it, can of course be so inflammatory as to risk a verdict impermissibly based on passion, not deliberation. Cf. *Penry* v. *Lynaugh,* 492 U. S. 302, 319–328 (1989) (capital sentence should be imposed as a "'reasoned moral response'") (quoting *California* v. *Brown,* 479 U. S. 538, 545 (1987) (O'CONNOR, J., concurring)); *Gholson* v. *Estelle,* 675 F. 2d 734, 738 (CA5 1982) ("If a person is to be executed, it should be as a result of a decision based on reason and reliable evidence"). But this is just as true when the defendant knew of the specific facts as when he was ignorant of their details, and in each case there is a traditional guard against the inflammatory risk, in the trial judge's authority and responsibility to control the proceedings consistently with due process, on which ground defendants may object and, if necessary, appeal. See *Darden* v. *Wainwright,* 477 U. S. 168, 178–183 (1986) (due process standard of fundamental fairness governs argument of prosecutor at sentencing); *United States* v. *Serhant,* 740 F. 2d 548, 551–552 (CA7 1984) (applying due process to purportedly "inflammatory" victim impact statements); see also *Lesko* v. *Lehman,* 925 F. 2d 1527, 1545–1547 (CA3 1991); *Coleman* v. *Saffle,* 869 F. 2d 1377, 1394–1396 (CA10 1989), cert. denied, 494 U. S. 1090

(1990); *Rushing* v. *Butler*, 868 F. 2d 800, 806–807 (CA5 1989). With the command of due process before us, this Court and the other courts of the state and federal systems will perform the "duty to search for constitutional error with painstaking care," an obligation "never more exacting than it is in a capital case." *Burger* v. *Kemp*, 483 U. S. 776, 785 (1987).

*Booth, supra,*[2] nonetheless goes further and imposes a blanket prohibition on consideration of evidence of the victim's individuality and the consequential harm to survivors as irrelevant to the choice between imprisonment and execution, except when such evidence goes to the "circumstances of the crime," *id.*, at 502, and probably then only when the facts in question were known to the defendant and relevant to his decision to kill, *id.*, at 505. This prohibition rests on the belief that consideration of such details about the victim and survivors as may have been outside the defendant's knowledge is inconsistent with the sentencing jury's Eighth Amendment duty "in the unique circumstance of a capital sentencing hearing . . . to focus on the defendant as a 'uniquely individual human bein[g].'" *Id.*, at 504 (quoting *Woodson* v. *North Carolina*, 428 U. S. 280, 304 (1976) (plurality opinion of Stewart, Powell, and STEVENS, JJ.)). The assumption made is that the obligation to consider the defendant's uniqueness limits the data about a crime's impact, on which a defendant's moral guilt may be calculated, to the facts he specifically knew and presumably considered. His uniqueness, in other words, is defined by the specifics of his knowledge and the reasoning that is thought to follow from it.

To hold, however, that in setting the appropriate sentence a defendant must be considered in his uniqueness is not to require that only unique qualities be considered. While a defendant's anticipation of specific consequences to the victims of his intended act is relevant to sentencing, such detailed

---

[2] Because this discussion goes only to the underlying substantive rule in question, for brevity I will confine most references to *Booth* alone.

foreknowledge does not exhaust the category of morally relevant fact. One such fact that is known to all murderers and relevant to the blameworthiness of each one was identified by the *Booth* majority itself when it barred the sentencing authority in capital cases from considering "the full range of foreseeable consequences of a defendant's actions." 482 U. S., at 504. Murder has foreseeable consequences. When it happens, it is always to distinct individuals, and, after it happens, other victims are left behind. Every defendant knows, if endowed with the mental competence for criminal responsibility, that the life he will take by his homicidal behavior is that of a unique person, like himself, and that the person to be killed probably has close associates, "survivors," who will suffer harms and deprivations from the victim's death. Just as defendants know that they are not faceless human ciphers, they know that their victims are not valueless fungibles; and just as defendants appreciate the web of relationships and dependencies in which they live, they know that their victims are not human islands, but individuals with parents or children, spouses or friends or dependents. Thus, when a defendant chooses to kill, or to raise the risk of a victim's death, this choice necessarily relates to a whole human being and threatens an association of others, who may be distinctly hurt. The fact that the defendant may not know the details of a victim's life and characteristics, or the exact identities and needs of those who may survive, should not in any way obscure the further facts that death is always to a "unique" individual, and harm to some group of survivors is a consequence of a successful homicidal act so foreseeable as to be virtually inevitable.

That foreseeability of the killing's consequences imbues them with direct moral relevance, cf. *Penry* v. *Lynaugh*, *supra*, at 328 (death penalty should be "'reasoned moral response'"), and evidence of the specific harm caused when a homicidal risk is realized is nothing more than evidence of the risk that the defendant originally chose to run despite the

kinds of consequences that were obviously foreseeable. It is morally both defensible and appropriate to consider such evidence when penalizing a murderer, like other criminals, in light of common knowledge and the moral responsibility that such knowledge entails. Any failure to take account of a victim's individuality and the effects of his death upon close survivors would thus more appropriately be called an act of lenity than their consideration an invitation to arbitrary sentencing. Indeed, given a defendant's option to introduce relevant evidence in mitigation, see, *e. g., Eddings* v. *Oklahoma,* 455 U. S. 104, 113–114 (1982); *Lockett* v. *Ohio,* 438 U. S. 586, 604 (1978), sentencing without such evidence of victim impact may be seen as a significantly imbalanced process. See *Mills* v. *Maryland,* 486 U. S. 367, 397 (1988) (REHNQUIST, C. J., dissenting).

I so view the relevance of the two categories of victim impact evidence at issue here, and I fully agree with the majority's conclusion, and the opinions expressed by the dissenters in *Booth* and *Gathers,* that nothing in the Eighth Amendment's condemnation of cruel and unusual punishment would require that evidence to be excluded. See *ante,* at 827 ("[I]f the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar"); *Booth, supra,* at 515–516 (WHITE, J., dissenting) (nothing "'cruel or unusual' or otherwise unconstitutional about the legislature's decision to use victim impact statements in capital sentencing hearings"); *Gathers,* 490 U. S., at 816–821 (O'CONNOR, J., dissenting); *id.,* at 823–825 (SCALIA, J., dissenting).

I do not, however, rest my decision to overrule wholly on the constitutional error that I see in the cases in question. I must rely as well on my further view that *Booth* sets an unworkable standard of constitutional relevance that threatens, on its own terms, to produce such arbitrary consequences and uncertainty of application as virtually to guarantee a result far diminished from the case's promise of appropriately

individualized sentencing for capital defendants. 482 U. S., at 502. These conclusions will be seen to result from the interaction of three facts. First, although *Booth* was prompted by the introduction of a systematically prepared "victim impact statement" at the sentencing phase of the trial, *Booth*'s restriction of relevant facts to what the defendant knew and considered in deciding to kill applies to any evidence, however derived or presented. Second, details of which the defendant was unaware, about the victim and survivors, will customarily be disclosed by the evidence introduced at the guilt phase of the trial. Third, the jury that determines guilt will usually determine, or make recommendations about, the imposition of capital punishment.

A hypothetical case will illustrate these facts and raise what I view as the serious practical problems with application of the *Booth* standard. Assume that a minister, unidentified as such and wearing no clerical collar, walks down a street to his church office on a brief errand, while his wife and adolescent daughter wait for him in a parked car. He is robbed and killed by a stranger, and his survivors witness his death. What are the circumstances of the crime that can be considered at the sentencing phase under *Booth?* The defendant did not know his victim was a minister, or that he had a wife and child, let alone that they were watching. Under *Booth*, these facts were irrelevant to his decision to kill, and they should be barred from consideration at sentencing. Yet evidence of them will surely be admitted at the guilt phase of the trial. The widow will testify to what she saw, and, in so doing, she will not be asked to pretend that she was a mere bystander. She could not succeed at that if she tried. The daughter may well testify too. The jury will not be kept from knowing that the victim was a minister, with a wife and child, on an errand to his church. This is so not only because the widow will not try to deceive the jury about her relationship, but also because the usual standards of trial relevance afford factfinders enough information about

surrounding circumstances to let them make sense of the narrowly material facts of the crime itself. No one claims that jurors in a capital case should be deprived of such common contextual evidence, even though the defendant knew nothing about the errand, the victim's occupation, or his family. And yet, if these facts are not kept from the jury at the guilt stage, they will be in the jurors' minds at the sentencing stage.

*Booth* thus raises a dilemma with very practical consequences. If we were to require the rules of guilt-phase evidence to be changed to guarantee the full effect of *Booth*'s promise to exclude consideration of specific facts unknown to the defendant and thus supposedly without significance in morally evaluating his decision to kill, we would seriously reduce the comprehensibility of most trials by depriving jurors of those details of context that allow them to understand what is being described. If, on the other hand, we are to leave the rules of trial evidence alone, *Booth*'s objective will not be attained without requiring a separate sentencing jury to be empaneled. This would be a major imposition on the States, however, and I suppose that no one would seriously consider adding such a further requirement.

But, even if *Booth* were extended one way or the other to exclude completely from the sentencing proceeding all facts about the crime's victims not known by the defendant, the case would be vulnerable to the further charge that it would lead to arbitrary sentencing results. In the preceding hypothetical, *Booth* would require that all evidence about the victim's family, including its very existence, be excluded from sentencing consideration because the defendant did not know of it when he killed the victim. Yet, if the victim's daughter had screamed "Daddy, look out," as the defendant approached the victim with drawn gun, then the evidence of at least the daughter's survivorship would be admissible even under a strict reading of *Booth*, because the defendant, prior to killing, had been made aware of the daughter's existence,

which therefore became relevant in evaluating the defendant's decision to kill. Resting a decision about the admission of impact evidence on such a fortuity is arbitrary.

Thus, the status quo is unsatisfactory, and the question is whether the case that has produced it should be overruled. In this instance, as in any other, overruling a precedent of this Court is a matter of no small import, for "the doctrine of *stare decisis* is of fundamental importance to the rule of law." *Welch* v. *Texas Dept. of Highways and Public Transportation,* 483 U. S. 468, 494 (1987). To be sure, *stare decisis* is not an "inexorable command," *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 405 (1932) (Brandeis, J., dissenting); and our "considered practice [has] not [been] to apply *stare decisis* as rigidly in constitutional [cases] as in nonconstitutional cases," *Glidden Co.* v. *Zdanok,* 370 U. S. 530, 543 (1962). See *Burnet, supra,* at 405–407; *Patterson* v. *McLean Credit Union,* 491 U. S. 164, 172–173 (1989). But, even in constitutional cases, the doctrine carries such persuasive force that we have always required a departure from precedent to be supported by some "special justification." *Arizona* v. *Rumsey,* 467 U. S. 203, 212 (1984).

The Court has a special justification in this case. *Booth* promises more than it can deliver, given the unresolved tension between common evidentiary standards at the guilt phase and *Booth*'s promise of a sentencing determination free from the consideration of facts unknown to the defendant and irrelevant to his decision to kill. An extension of the case to guarantee a sentencing authority free from the influence of information extraneous under *Booth* would be either an unworkable or a costly extension of an erroneous principle and would itself create a risk of arbitrary results. There is only one other course open to us. We can recede from the erroneous holding that created the tension and extended the false promise, and there is precedent in our *stare decisis* jurisprudence for doing just this. In prior cases, when this Court has confronted a wrongly decided, unworkable

precedent calling for some further action by the Court, we have chosen not to compound the original error, but to overrule the precedent. See *Swift & Co.* v. *Wickham*, 382 U. S. 111 (1965);[3] *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36 (1977);[4] see also *Patterson* v. *McLean Credit*

[3] In *Swift & Co.* v. *Wickham*, the Court overruled *Kesler* v. *Department of Public Safety of Utah*, 369 U. S. 153 (1962). The issue presented in both *Swift* and *Kesler* concerned the application of the three-judge district court statute, 28 U. S. C. § 2281 (1970 ed.), in cases of alleged state statutory pre-emption by federal law. The Court had held in *Kesler* that "§ 2281 comes into play only when the Supremacy Clause of the Federal Constitution is immediately drawn in question, but not when issues of federal or state statutory construction must first be decided even though the Supremacy Clause may ultimately be implicated." 382 U. S., at 115.

Three years later in *Swift & Co.* v. *Wickham*, a majority of the Court disagreed with the *Kesler* analysis of the question, finding it inconsistent with the statute and earlier precedents of this Court. 382 U. S., at 122 ("The upshot of these decisions seems abundantly clear: Supremacy Clause cases are not within the purview of § 2281"). The Court concluded that there were

"[t]wo possible interpretations of § 2281 [that] would provide a more practical rule for three-judge court jurisdiction. The first is that *Kesler* might be extended to hold, as some of its language might be thought to indicate, that *all* suits to enjoin the enforcement of a state statute, whatever the federal ground, must be channeled through three-judge courts. The second is that *no* such suits resting solely on 'supremacy' grounds fall within the statute." *Id.*, at 125 (footnote omitted).

Rather than extend the incorrectly decided opinion in *Kesler*, the Court decided to overrule it. 382 U. S., at 126–127.

[4] In *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, the Court overruled *United States* v. *Arnold, Schwinn & Co.*, 388 U. S. 365 (1967), which had held that "[u]nder the Sherman Act, it is *[per se]* unreasonable . . . for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it." *Id.*, at 379. The decision distinguished between restrictions on retailers based on whether the underlying transaction was a sale, in which case the Court applied a *per se* ban, or not a sale, in which case the arrangement would be subject to a "rule of reason" analysis. In *Continental T. V., Inc.*, the Court reconsidered this *per se* rule in light of our traditional reliance on a "rule of reason" analysis for § 1 claims under the Sherman Act and the "continuing controversy and confusion, both in the

*Union, supra,* at 173. Following this course here has itself the support not only of precedent but of practical sense as well. Therefore, I join the Court in its partial overruling of *Booth* and *Gathers.*

JUSTICE MARSHALL, with whom JUSTICE BLACKMUN joins, dissenting.

Power, not reason, is the new currency of this Court's decisionmaking. Four Terms ago, a five-Justice majority of this Court held that "victim impact" evidence of the type at issue in this case could not constitutionally be introduced during the penalty phase of a capital trial. *Booth* v. *Maryland,* 482 U. S. 496 (1987). By another 5–4 vote, a majority of this Court rebuffed an attack upon this ruling just two Terms ago. *South Carolina* v. *Gathers,* 490 U. S. 805 (1989). Nevertheless, having expressly invited respondent to renew the attack, 498 U. S. 1076 (1991), today's majority overrules *Booth* and *Gathers* and credits the dissenting views expressed in those cases. Neither the law nor the facts supporting *Booth* and *Gathers* underwent any change in the last four years. Only the personnel of this Court did.

In dispatching *Booth* and *Gathers* to their graves, today's majority ominously suggests that an even more extensive upheaval of this Court's precedents may be in store. Renouncing this Court's historical commitment to a conception of "the judiciary as a source of impersonal and reasoned judgments," *Moragne* v. *States Marine Lines,* 398 U. S. 375, 403 (1970),

---

scholarly journals and in the federal courts" caused by the sale/nonsale distinction drawn by the Court in *Schwinn.* 433 U. S., at 47–56. The Court proceeded to reexamination and concluded "that the distinction drawn in *Schwinn* between sale and nonsale transactions is not sufficient to justify the application of a *per se* rule in one situation and a rule of reason in the other. The question remains whether the *per se* rule stated in *Schwinn* should be expanded to include nonsale transactions or abandoned in favor of a return to the rule of reason." *Id.,* at 57. The Court found "no persuasive support for expanding the *per se* rule," and *Schwinn* was overruled. 433 U. S., at 57.

the majority declares itself free to discard any principle of constitutional liberty which was recognized or reaffirmed over the dissenting votes of four Justices and with which five or more Justices *now* disagree.  The implications of this radical new exception to the doctrine of *stare decisis* are staggering.  The majority today sends a clear signal that scores of established constitutional liberties are now ripe for reconsideration, thereby inviting the very type of open defiance of our precedents that the majority rewards in this case.  Because I believe that this Court owes more to its constitutional precedents in general and to *Booth* and *Gathers* in particular, I dissent.

## I

Speaking for the Court as then constituted, Justice Powell and Justice Brennan set out the rationale for excluding victim-impact evidence from the sentencing proceedings in a capital case.  See *Booth* v. *Maryland, supra,* at 504–509; *South Carolina* v. *Gathers, supra,* at 810–811.  As the majorities in *Booth* and *Gathers* recognized, the core principle of this Court's capital jurisprudence is that the sentence of death must reflect an "*'individualized* determination'" of the defendant's "'personal responsibility and moral guilt'" and must be based upon factors that channel the jury's discretion "'so as to minimize the risk of wholly arbitrary and capricious action.'"  *Booth* v. *Maryland, supra,* at 502, quoting *Zant* v. *Stephens,* 462 U. S. 862, 879 (1983); *Enmund* v. *Florida,* 458 U. S. 782, 801 (1982), and *Gregg* v. *Georgia,* 428 U. S. 153, 189 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.); accord, *South Carolina* v. *Gathers, supra,* at 810.  The State's introduction of victim-impact evidence, Justice Powell and Justice Brennan explained, violates this fundamental principle.  Where, as is ordinarily the case, the defendant was unaware of the personal circumstances of his victim, admitting evidence of the victim's character and the impact of the murder upon the victim's family predicates the sentencing determination on "factors . . . wholly unrelated to the

blameworthiness of [the] particular defendant." *Booth* v. *Maryland, supra,* at 504; *South Carolina* v. *Gathers, supra,* at 810. And even where the defendant *was* in a position to foresee the likely impact of his conduct, admission of victim-impact evidence creates an unacceptable risk of sentencing arbitrariness. As Justice Powell explained in *Booth,* the probative value of such evidence is always outweighed by its prejudicial effect because of its inherent capacity to draw the jury's attention away from the character of the defendant and the circumstances of the crime to such illicit considerations as the eloquence with which family members express their grief and the status of the victim in the community. See *Booth* v. *Maryland, supra,* at 505–507, and n. 8; *South Carolina* v. *Gathers, supra,* at 810–811. I continue to find these considerations wholly persuasive, and I see no purpose in trying to improve upon Justice Powell's and Justice Brennan's exposition of them.

There is nothing new in the majority's discussion of the supposed deficiencies in *Booth* and *Gathers.* Every one of the arguments made by the majority can be found in the dissenting opinions filed in those two cases, and, as I show in the margin, each argument was convincingly answered by Justice Powell and Justice Brennan.[1]

---

[1] The majority's primary argument is that punishment in criminal law is frequently based on an "assessment of [the] harm caused by the defendant as a result of the crime charged." *Ante,* at 819. See also *Booth* v. *Maryland,* 482 U. S. 496, 516 (1987) (WHITE, J., dissenting); *id.,* at 519–520 (SCALIA, J., dissenting); *South Carolina* v. *Gathers,* 490 U. S. 805, 818–819 (1989) (O'CONNOR, J., dissenting). Nothing in *Booth* or *Gathers,* however, conflicts with this unremarkable observation. These cases stand merely for the proposition that the State may not put on evidence of *one* particular species of harm—namely, that associated with the victim's personal characteristics independent of the circumstances of the offense—in the course of *a capital murder proceeding.* See *Booth* v. *Maryland, supra,* at 507, n. 10 (emphasizing that decision does not bar reliance on victim-impact evidence in capital sentencing so long as such evidence "relate[s] directly to the circumstances of the crime"); *id.,* at 509, n. 12 (emphasizing that decision does not bar reliance on victim-impact evidence

But contrary to the impression that one might receive from reading the majority's lengthy rehearsing of the issues addressed in *Booth* and *Gathers*, the outcome of this case does

---

in sentencing for noncapital crimes). It may be the case that such a rule departs from the latitude of sentencers in criminal law generally to "tak[e] into consideration the harm done by the defendant." *Ante*, at 825. But as the *Booth* Court pointed out, because this Court's capital-sentencing jurisprudence is founded on the premise that "death is a 'punishment different from all other sanctions,'" it is completely unavailing to attempt to infer from sentencing considerations in noncapital settings the proper treatment of any particular sentencing issue in a capital case. 482 U. S., at 509, n. 12, quoting *Woodson* v. *North Carolina*, 428 U. S. 280, 303–304, 305 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.).

The majority also discounts Justice Powell's concern with the inherently prejudicial quality of victim-impact evidence. "[T]he mere fact that for tactical reasons it might not be prudent for the defense to rebut victim impact evidence," the majority protests, "makes the case no different than others in which a party is faced with this sort of a dilemma." *Ante*, at 823. See also *Booth* v. *Maryland*, *supra*, at 518 (WHITE, J., dissenting). Unsurprisingly, this tautology is completely unresponsive to Justice Powell's argument. The *Booth* Court established a rule excluding introduction of victim-impact evidence not merely because it is difficult to rebut—a feature of victim-impact evidence that may be "no different" from that of many varieties of relevant, legitimate evidence—but because the effect of this evidence in the sentencing proceeding is *unfairly prejudicial*: "The prospect of a 'mini-trial' on the victim's character is more than simply unappealing; it could well distract the sentencing jury from its constitutionally required task—determining whether the death penalty is appropriate in light of the background and record of the accused and the particular circumstances of the crime." 482 U. S., at 507. The law is replete with *per se* prohibitions of types of evidence the probative effect of which is generally outweighed by its unfair prejudice. See, *e. g.*, Fed. Rules Evid. 404, 407–412. There is nothing anomalous in the notion that the Eighth Amendment would similarly exclude evidence that has an undue capacity to undermine the regime of individualized sentencing that our capital jurisprudence demands.

Finally, the majority contends that the exclusion of victim-impact evidence "deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder." *Ante*, at 825. The majority's recycled contention, see *Booth*, *supra*, at 517 (WHITE, J.,

not turn simply on who—the *Booth* and *Gathers* majorities or the *Booth* and *Gathers* dissenters—had the better of the argument. Justice Powell and Justice Brennan's position carried the day in those cases and became the law of the land. The real question, then, is whether today's majority has come forward with the type of extraordinary showing that this Court has historically demanded before overruling one of its precedents. In my view, the majority clearly has not made any such showing. Indeed, the striking feature of the majority's opinion is its radical assertion that it need not even try.

## II

The overruling of one of this Court's precedents ought to be a matter of great moment and consequence. Although the doctrine of *stare decisis* is not an "inexorable command," *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 405 (1932) (Brandeis, J., dissenting), this Court has repeatedly stressed that fidelity to precedent is fundamental to "a society governed by the rule of law," *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 420 (1983). See generally *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172 (1989) ("[I]t is indisputable that *stare decisis* is a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon

dissenting); *id.*, at 520 (SCALIA, J., dissenting); *Gathers, supra,* at 817–818 (O'CONNOR, J., dissenting), begs the question. Before it is possible to conclude that the exclusion of victim-impact evidence prevents the State from making its case or the jury from considering relevant evidence, it is necessary to determine whether victim-impact evidence is consistent with the substantive standards that define the scope of permissible sentencing determinations under the Eighth Amendment. The majority offers no persuasive answer to Justice Powell and Justice Brennan's conclusion that victim-impact evidence is frequently *irrelevant* to any permissible sentencing consideration and that such evidence risks exerting *illegitimate* "moral force" by directing the jury's attention on illicit considerations such as the victim's standing in the community.

'an arbitrary discretion.' The Federalist, No. 78, p. 490 (H. Lodge ed. 1888) (A. Hamilton)"); *Appeal of Concerned Corporators of Portsmouth Savings Bank,* 129 N. H. 183, 227, 525 A. 2d 671, 701 (1987) (Souter, J., dissenting) (*"[S]tare decisis . . .* 'is essential if case-by-case judicial decision-making is to be reconciled with the principle of the rule of law, for when governing legal standards are open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results,'" quoting *Thornburgh* v. *American College of Obstetricians and Gynecologists,* 476 U. S. 747, 786–787 (1986) (WHITE, J., dissenting)).

Consequently, this Court has never departed from precedent without "special justification." *Arizona* v. *Rumsey,* 467 U. S. 203, 212 (1984). Such justifications include the advent of "subsequent changes or development in the law" that undermine a decision's rationale, *Patterson* v. *McLean Credit Union, supra,* at 173; the need "to bring [a decision] into agreement with experience and with facts newly ascertained," *Burnet* v. *Coronado Oil & Gas Co., supra,* at 412 (Brandeis, J., dissenting); and a showing that a particular precedent has become a "detriment to coherence and consistency in the law," *Patterson* v. *McLean Credit Union, supra,* at 173.

The majority cannot seriously claim that *any* of these traditional bases for overruling a precedent applies to *Booth* or *Gathers.* The majority does not suggest that the legal rationale of these decisions has been undercut by changes or developments in doctrine during the last two years. Nor does the majority claim that experience over that period of time has discredited the principle that "any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion," *Gardner* v. *Florida,* 430 U. S. 349, 358 (1977) (plurality opinion), the larger postulate of political morality on which *Booth* and *Gathers* rest.

The majority does assert that *Booth* and *Gathers* "have defied consistent application by the lower courts," *ante,* at 830,

but the evidence that the majority proffers is so feeble that the majority cannot sincerely expect anyone to believe this claim. To support its contention, the majority points to JUSTICE O'CONNOR's dissent in *Gathers*, which noted a division among lower courts over whether *Booth* prohibited prosecutorial arguments relating to the victim's personal characteristics. See 490 U. S., at 813. That, of course, was the issue expressly considered and resolved in *Gathers*. The majority also cites THE CHIEF JUSTICE's dissent in *Mills* v. *Maryland*, 486 U. S. 367, 395–398 (1988). That opinion does not contain a *single word* about any supposed "[in]consistent application" of *Booth* in the lower courts. Finally, the majority refers to a divided Ohio Supreme Court decision disposing of an issue concerning victim-impact evidence. See *State* v. *Huertas*, 51 Ohio St. 3d 22, 553 N. E. 2d 1058 (1990), cert. dism'd as improvidently granted, 498 U. S. 336 (1991). Obviously, if a division among the members of a single lower court in a single case were sufficient to demonstrate that a particular precedent was a "detriment to coherence and consistency in the law," *Patterson* v. *McLean Credit Union*, *supra*, at 173, there would hardly be a decision in United States Reports that we would not be obliged to reconsider.

It takes little real detective work to discern just what *has* changed since this Court decided *Booth* and *Gathers*: this Court's own personnel. Indeed, the majority candidly explains why this particular contingency, which until now has been almost universally understood *not* to be sufficient to warrant overruling a precedent, see, *e. g., Florida Dept. of Health and Rehabilitative Services* v. *Florida Nursing Home Assn.*, 450 U. S. 147, 153 (1981) (STEVENS, J., concurring); *Mitchell* v. *W. T. Grant Co.*, 416 U. S. 600, 636 (1974) (Stewart, J., dissenting); *Mapp* v. *Ohio*, 367 U. S. 643, 677 (1961) (Harlan, J., dissenting); but see *South Carolina* v. *Gathers*, *supra*, at 824 (SCALIA, J., dissenting), *is* sufficient to justify overruling *Booth* and *Gathers*. "Considerations in favor of *stare decisis* are at their acme," the majority explains, "in

cases involving property and contract rights, where reliance interests are involved[;] the opposite is true in cases such as the present one involving procedural and evidentiary rules." *Ante*, at 828 (citations omitted). In addition, the majority points out, "*Booth* and *Gathers* were decided by the narrowest of margins, over spirited dissents" and thereafter were "questioned by Members of the Court." *Ante*, at 828–829. Taken together, these considerations make it legitimate, in the majority's view, to elevate the position of the *Booth* and *Gathers* dissenters into the law of the land.

This truncation of the Court's duty to stand by its own precedents is astonishing. By limiting full protection of the doctrine of *stare decisis* to "cases involving property and contract rights," *ante*, at 828, the majority sends a clear signal that essentially *all* decisions implementing the personal liberties protected by the Bill of Rights and the Fourteenth Amendment are open to reexamination. Taking into account the majority's additional criterion for overruling—that a case either was decided or reaffirmed by a 5–4 margin "over spirited dissen[t]," *ante*, at 829—the continued vitality of literally scores of decisions must be understood to depend on nothing more than the proclivities of the individuals who *now* comprise a majority of this Court. See, *e. g.*, *Metro Broadcasting* v. *FCC*, 497 U. S. 547 (1990) (authority of Federal government to set aside broadcast licenses for minority applicants); *Grady* v. *Corbin*, 495 U. S. 508 (1990) (right under Double Jeopardy Clause not to be subjected twice to prosecution for same criminal conduct); *Mills* v. *Maryland*, *supra* (Eighth Amendment right to jury instructions that do not preclude consideration of nonunanimous mitigating factors in capital sentencing); *United States* v. *Paradise*, 480 U. S. 149 (1987) (right to promotions as remedy for racial discrimination in government hiring); *Ford* v. *Wainwright*, 477 U. S. 399 (1986) (Eighth Amendment right not to be executed if insane); *Thornburgh* v. *American College of Obstetricians and Gynecologists*, 476 U. S. 747 (1986) (reaffirming

right to abortion recognized in *Roe* v. *Wade,* 410 U. S. 113 (1973)); *Aguilar* v. *Felton,* 473 U. S. 402 (1985) (Establishment Clause bar on governmental financial assistance to parochial schools).[2]

In my view, this impoverished conception of *stare decisis* cannot possibly be reconciled with the values that inform the proper judicial function. Contrary to what the majority suggests, *stare decisis* is important not merely because individuals rely on precedent to structure their commercial activity but because fidelity to precedent is part and parcel of a conception of "the judiciary as a source of impersonal and reasoned judgments." *Moragne* v. *States Marine Lines,* 398 U. S., at 403. Indeed, this function of *stare decisis* is in many respects even *more* critical in adjudication involving constitutional liberties than in adjudication involving com-

---

[2] Based on the majority's new criteria for overruling, these decisions, too, must be included on the "endangered precedents" list: *Rutan* v. *Republican Party of Illinois,* 497 U. S. 62 (1990) (First Amendment right not to be denied public employment on the basis of party affiliation); *Peel* v. *Attorney Registration and Disciplinary Comm'n of Ill.,* 496 U. S. 91 (1990) (First Amendment right to advertise legal specialization); *Zinermon* v. *Burch,* 494 U. S. 113 (1990) (due process right to procedural safeguards aimed at assuring voluntariness of decision to commit oneself to mental hospital); *James* v. *Illinois,* 493 U. S. 307 (1990) (Fourth Amendment right to exclusion of illegally obtained evidence introduced for impeachment of defense witness); *Rankin* v. *McPherson,* 483 U. S. 378 (1987) (First Amendment right of public employee to express views on matter of public importance); *Rock* v. *Arkansas,* 483 U. S. 44 (1987) (Fifth Amendment and Sixth Amendment right of criminal defendant to provide hypnotically refreshed testimony on his own behalf); *Gray* v. *Mississippi,* 481 U. S. 648 (1987) (rejecting applicability of harmless error analysis to Eighth Amendment right not to be sentenced to death by "death qualified" jury); *Maine* v. *Moulton,* 474 U. S. 159 (1985) (Sixth Amendment right to counsel violated by introduction of statements made to government informant-codefendant in course of preparing defense strategy); *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U. S. 528 (1985) (rejecting theory that Tenth Amendment provides immunity to States from federal regulation); *Pulliam* v. *Allen,* 466 U. S. 522 (1984) (right to obtain injunctive relief from constitutional violations committed by judicial officials).

mercial entitlements.   Because enforcement of the Bill of Rights and the Fourteenth Amendment frequently requires this Court to rein in the forces of democratic politics, this Court can legitimately lay claim to compliance with its directives only if the public understands the Court to be implementing "principles . . . founded in the law rather than in the proclivities of individuals." *Vasquez* v. *Hillery*, 474 U. S. 254, 265 (1986).[3]   Thus, as JUSTICE STEVENS has explained, the "stron[g] presumption of validity" to which "recently decided cases" are entitled "is an essential thread in the mantle of protection that the law affords the individual. . . . It is the unpopular or beleaguered individual—not the man in power—who has the greatest stake in the integrity of the law." *Florida Dept. of Health and Rehabilitative Services* v. *Florida Nursing Home Assn.*, 450 U. S., at 153–154 (concurring opinion).

Carried to its logical conclusion, the majority's debilitated conception of *stare decisis* would destroy the Court's very capacity to resolve authoritatively the abiding conflicts between those with power and those without.   If this Court shows so little respect for its own precedents, it can hardly expect them to be treated more respectfully by the state actors whom these decisions are supposed to bind.   See

---

[3] It does not answer this concern to suggest that Justices owe fidelity to the text of the Constitution rather than to the case law of this Court interpreting the Constitution.   See, *e. g.*, *South Carolina* v. *Gathers*, 490 U. S., at 825 (SCALIA, J., dissenting).   The text of the Constitution is rarely so plain as to be self-executing; invariably, this Court must develop mediating principles and doctrines in order to bring the text of constitutional provisions to bear on particular facts.   Thus, to rebut the charge of personal lawmaking, Justices who would discard the mediating principles embodied in precedent must do more than state that they are following the "text" of the Constitution; they must explain why they are entitled to substitute *their* mediating principles for those that are already settled in the law.   And such an explanation will be sufficient to legitimize the departure from precedent only if it measures up to the extraordinary standard necessary to justify overruling one of this Court's precedents.   See generally Note, 103 Harv. L. Rev. 1344, 1351–1354 (1990).

*Mitchell* v. *W. T. Grant Co.*, 416 U. S., at 634 (Stewart, J., dissenting). By signaling its willingness to give fresh consideration to any constitutional liberty recognized by a 5–4 vote "over spirited dissen[t]," *ante*, at 829, the majority invites state actors to renew the very policies deemed unconstitutional in the hope that this Court may now reverse course, even if it has only recently reaffirmed the constitutional liberty in question.

Indeed, the majority's disposition of this case nicely illustrates the rewards of such a strategy of defiance. The Tennessee Supreme Court did nothing in this case to disguise its contempt for this Court's decisions in *Booth* and *Gathers*. Summing up its reaction to those cases, it concluded:

> "It is an affront to the civilized members of the human race to say that at sentencing in a capital case, a parade of witnesses may praise the background, character and good deeds of Defendant (as was done in this case), without limitation as to relevancy, but nothing may be said that bears upon the character of, or harm imposed, upon the victims." 791 S. W. 2d 10, 19 (1990).

Offering no explanation for how this case could possibly be distinguished from *Booth* and *Gathers*—for obviously, there is none to offer—the court perfunctorily declared that the victim-impact evidence and the prosecutor's argument based on this evidence "did not violate either [of those decisions]." *Ibid.* It cannot be clearer that the court simply declined to be bound by this Court's precedents.[4]

---

[4] Equally unsatisfactory is the Tennessee Supreme Court's purported finding that any error associated with the victim-impact evidence in this case was harmless. See 791 S. W. 2d, at 19. This finding was based on the court's conclusion that "the death penalty was the only rational punishment available" in light of the "inhuman brutality" evident in the circumstances of the murder. *Ibid.* It is well established that a State cannot make the death penalty mandatory for any class of aggravated murder; no matter how "brutal" the circumstances of the offense, the State must permit the sentencer discretion to impose a sentence of less than death. See

Far from condemning this blatant disregard for the rule of law, the majority applauds it. In the Tennessee Supreme Court's denigration of *Booth* and *Gathers* as "'an affront to the civilized members of the human race,'" the majority finds only confirmation of "the unfairness of the rule pronounced by" the majorities in those cases. *Ante*, at 826. It is hard to imagine a more complete abdication of this Court's historic commitment to defending the supremacy of its own pronouncements on issues of constitutional liberty. See *Cooper* v. *Aaron*, 358 U. S. 1 (1958); see also *Hutto* v. *Davis*, 454 U. S. 370, 375 (1982) (per curiam) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be"). In light of the cost that such abdication exacts on the authoritativeness of *all* of this Court's pronouncements, it is also hard to imagine a more short-sighted strategy for effecting change in our constitutional order.

---

*Roberts* v. *Louisiana*, 428 U. S. 325 (1976); *Woodson* v. *North Carolina*, 428 U. S. 280 (1976). It follows that an appellate court cannot deem error to be automatically *harmless* based solely on the aggravated character of a murder without assessing the impact of the error on the sentencer's discretion. Cf. *Clemons* v. *Mississippi*, 494 U. S. 738, 751–752 (1990).

To sentence petitioner to death, the jury was required to find that the mitigating circumstances shown by petitioner did not outweigh the aggravating circumstances. See App. 21–22. In what it tried to pass off as harmless error analysis, the Tennessee Supreme Court failed to address how the victim-impact evidence introduced during the sentencing proceedings in this case likely affected the jury's determination that the balance of aggravating and mitigating circumstances dictated a death sentence. Outside of a videotape of the crime scene, the State introduced *no* additional substantive evidence in the penalty phase *other than* the testimony of Mary Zvolanek, mother and grandmother of the murder victims. See 791 S. W. 2d, at 17. Under these circumstances, it is simply impossible to conclude that this victim-impact testimony, combined with the prosecutor's extrapolation from it in his closing argument, was harmless beyond a reasonable doubt.

## III

Today's decision charts an unmistakable course. If the majority's radical reconstruction of the rules for overturning this Court's decisions is to be taken at face value—and the majority offers us no reason why it should not—then the overruling of *Booth* and *Gathers* is but a preview of an even broader and more far-reaching assault upon this Court's precedents. Cast aside today are those condemned to face society's ultimate penalty. Tomorrow's victims may be minorities, women, or the indigent. Inevitably, this campaign to resurrect yesterday's "spirited dissents" will squander the authority and the legitimacy of this Court as a protector of the powerless.

I dissent.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

The novel rule that the Court announces today represents a dramatic departure from the principles that have governed our capital sentencing jurisprudence for decades. JUSTICE MARSHALL is properly concerned about the majority's trivialization of the doctrine of *stare decisis*. But even if *Booth* v. *Maryland*, 482 U. S. 496 (1987), and *South Carolina* v. *Gathers*, 490 U. S. 805 (1989), had not been decided, today's decision would represent a sharp break with past decisions. Our cases provide no support whatsoever for the majority's conclusion that the prosecutor may introduce evidence that sheds no light on the defendant's guilt or moral culpability, and thus serves no purpose other than to encourage jurors to decide in favor of death rather than life on the basis of their emotions rather than their reason.

Until today our capital punishment jurisprudence has required that any decision to impose the death penalty be based solely on evidence that tends to inform the jury about the character of the offense and the character of the defendant. Evidence that serves no purpose other than to appeal to the

sympathies or emotions of the jurors has never been considered admissible. Thus, if a defendant, who had murdered a convenience store clerk in cold blood in the course of an armed robbery, offered evidence unknown to him at the time of the crime about the immoral character of his victim, all would recognize immediately that the evidence was irrelevant and inadmissible. Evenhanded justice requires that the same constraint be imposed on the advocate of the death penalty.

## I

In *Williams* v. *New York,* 337 U. S. 241 (1949), this Court considered the scope of the inquiry that should precede the imposition of a death sentence. Relying on practices that had developed "both before and since the American colonies became a nation," *id.,* at 246, Justice Black described the wide latitude that had been accorded judges in considering the source and type of evidence that is relevant to the sentencing determination. Notably, that opinion refers not only to the relevance of evidence establishing the defendant's guilt, but also to the relevance of "the fullest information possible concerning the defendant's life and characteristics." *Id.,* at 247. "Victim impact" evidence, however, was unheard of when *Williams* was decided. The relevant evidence of harm to society consisted of proof that the defendant was guilty of the offense charged in the indictment.

Almost 30 years after our decision in *Williams,* the Court reviewed the scope of evidence relevant in capital sentencing. See *Lockett* v. *Ohio,* 438 U. S. 586 (1978). In his plurality opinion, Chief Justice Burger concluded that in a capital case, the sentencer must not be prevented "from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.,* at 604 (emphasis deleted). As in *Williams,* the character of the offense and the character of the offender constituted

the entire category of relevant evidence. "Victim impact" evidence was still unheard of when *Lockett* was decided.

As the Court acknowledges today, the use of victim impact evidence "is of recent origin," *ante*, at 821. Insofar as the Court's jurisprudence is concerned, this type of evidence made its first appearance in 1987 in *Booth* v. *Maryland*, 482 U. S. 496. In his opinion for the Court, Justice Powell noted that our prior cases had stated that the question whether an individual defendant should be executed is to be determined on the basis of "'the character of the individual and the circumstances of the crime,'" *id.*, at 502 (quoting *Zant* v. *Stephens*, 462 U. S. 862, 879 (1983)). See also *Eddings* v. *Oklahoma*, 455 U. S. 104, 112 (1982). Relying on those cases and on *Enmund* v. *Florida*, 458 U. S. 782, 801 (1982), the Court concluded that unless evidence has some bearing on the defendant's personal responsibility and moral guilt, its admission would create a risk that a death sentence might be based on considerations that are constitutionally impermissible or totally irrelevant to the sentencing process. 482 U. S., at 502. Evidence that served no purpose except to describe the personal characteristics of the victim and the emotional impact of the crime on the victim's family was therefore constitutionally irrelevant.

Our decision in *Booth* was entirely consistent with the practices that had been followed "both before and since the American colonies became a nation," *Williams*, 337 U. S., at 246. Our holding was mandated by our capital punishment jurisprudence, which requires any decision to impose the death penalty to be based on reason rather than caprice or emotion. See *Gardner* v. *Florida*, 430 U. S. 349, 362 (1977) (opinion of STEVENS, J.). The dissenting opinions in *Booth* and in *Gathers* can be searched in vain for any judicial precedent sanctioning the use of evidence unrelated to the character of the offense or the character of the offender in the sentencing process. Today, however, relying on nothing more than those dissenting opinions, the Court abandons

rules of relevance that are older than the Nation itself and ventures into uncharted seas of irrelevance.

## II

Today's majority has obviously been moved by an argument that has strong political appeal but no proper place in a reasoned judicial opinion. Because our decision in *Lockett*, 438 U. S., at 604 (opinion of Burger, C. J.), recognizes the defendant's right to introduce all mitigating evidence that may inform the jury about his character, the Court suggests that fairness requires that the State be allowed to respond with similar evidence about the *victim*. See *ante*, at 825–826.[1] This argument is a classic non sequitur: The victim is not on trial; her character, whether good or bad, cannot therefore constitute either an aggravating or a mitigating circumstance.

---

[1] JUSTICE SCALIA accurately described the argument in his dissent in *Booth* v. *Maryland*, 482 U. S. 496 (1987):

"Recent years have seen an outpouring of popular concern for what has come to be known as 'victims' rights'—a phrase that describes what its proponents feel is the failure of courts of justice to take into account in their sentencing decisions not only the factors mitigating the defendant's moral guilt, but also the amount of harm he has caused to innocent members of society. Many citizens have found one-sided and hence unjust the criminal trial in which a parade of witnesses comes forth to testify to the pressures beyond normal human experience that drove the defendant to commit his crime, with no one to lay before the sentencing authority the full reality of human suffering the defendant has produced—which (and *not* moral guilt alone) is one of the reasons society deems his act worthy of the prescribed penalty." *Id.*, at 520.

In his concurring opinion today, JUSTICE SCALIA again relies on the popular opinion that has "found voice in a nationwide 'victims' rights' movement." *Ante*, at 834. His view that the exclusion of evidence about "a crime's unanticipated consequences" "significantly harms our criminal justice system," *ibid.*, rests on the untenable premise that the strength of that system is to be measured by the number of death sentences that may be returned on the basis of such evidence. Because the word "arbitrary" is not to be found in the constitutional text, he apparently can find no reason to object to the arbitrary imposition of capital punishment.

Even if introduction of evidence about the victim could be equated with introduction of evidence about the defendant, the argument would remain flawed in both its premise and its conclusion. The conclusion that exclusion of victim impact evidence results in a significantly imbalanced sentencing procedure is simply inaccurate. Just as the defendant is entitled to introduce any relevant mitigating evidence, so the State may rebut that evidence and may designate any relevant conduct to be an aggravating factor provided that the factor is sufficiently well defined and consistently applied to cabin the sentencer's discretion.

The premise that a criminal prosecution requires an even-handed balance between the State and the defendant is also incorrect. The Constitution grants certain rights to the criminal defendant and imposes special limitations on the State designed to protect the individual from overreaching by the disproportionately powerful State. Thus, the State must prove a defendant's guilt beyond a reasonable doubt. See *In re Winship*, 397 U. S. 358 (1970). Rules of evidence are also weighted in the defendant's favor. For example, the prosecution generally cannot introduce evidence of the defendant's character to prove his propensity to commit a crime, but the defendant can introduce such reputation evidence to show his law-abiding nature. See, *e. g.*, Fed. Rule Evid. 404(a). Even if balance were required or desirable, today's decision, by permitting both the defendant and the State to introduce irrelevant evidence for the sentencer's consideration without any guidance, surely does nothing to enhance parity in the sentencing process.

### III

Victim impact evidence, as used in this case, has two flaws, both related to the Eighth Amendment's command that the punishment of death may not be meted out arbitrarily or capriciously. First, aspects of the character of the victim unforeseeable to the defendant at the time of his crime are irrel-

evant to the defendant's "personal responsibility and moral guilt" and therefore cannot justify a death sentence. See *Enmund* v. *Florida,* 458 U. S., at 801; see also *id.,* at 825 (O'CONNOR, J., dissenting) ("[P]roportionality requires a nexus between the punishment imposed and the defendant's blameworthiness"); *Tison* v. *Arizona,* 481 U. S. 137, 149 (1987) ("The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender"); *California* v. *Brown,* 479 U. S. 538, 545 (1987) (O'CONNOR, J., concurring).

Second, the quantity and quality of victim impact evidence sufficient to turn a verdict of life in prison into a verdict of death is not defined until after the crime has been committed and therefore cannot possibly be applied consistently in different cases. The sentencer's unguided consideration of victim impact evidence thus conflicts with the principle central to our capital punishment jurisprudence that, "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg* v. *Georgia,* 428 U. S. 153, 189 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.). Open-ended reliance by a capital sentencer on victim impact evidence simply does not provide a "principled way to distinguish [cases], in which the death penalty [i]s imposed, from the many cases in which it [i]s not." *Godfrey* v. *Georgia,* 446 U. S. 420, 433 (1980) (opinion of Stewart, J.).

The majority attempts to justify the admission of victim impact evidence by arguing that "consideration of the harm caused by the crime has been an important factor in the exercise of [sentencing] discretion." *Ante,* at 820. This statement is misleading and inaccurate. It is misleading because it is not limited to harm that is foreseeable. It is inaccurate because it fails to differentiate between legislative determinations and judicial sentencing. It is true that an evaluation of

the harm caused by different kinds of wrongful conduct is a critical aspect in legislative definitions of offenses and determinations concerning sentencing guidelines. There is a rational correlation between moral culpability and the foreseeable harm caused by criminal conduct. Moreover, in the capital sentencing area, legislative identification of the special aggravating factors that may justify the imposition of the death penalty is entirely appropriate.[2] But the majority cites no authority for the suggestion that unforeseeable and indirect harms to a victim's family are properly considered as aggravating evidence on a case-by-case basis.

The dissents in *Booth* and *Gathers* and the majority today offer only the recent decision in *Tison* v. *Arizona*, 481 U. S. 137 (1987), and two legislative examples to support their contention that harm to the victim has traditionally influenced sentencing discretion. *Tison* held that the death penalty may be imposed on a felon who acts with reckless disregard for human life if a death occurs in the course of the felony, even though capital punishment cannot be imposed if no one dies as a result of the crime. The first legislative example is that attempted murder and murder are classified as two different offenses subject to different punishments. *Ante*, at 819. The second legislative example is that a person who drives while intoxicated is guilty of vehicular homicide if his actions result in a death but is not guilty of this offense if he has the good fortune to make it home without killing anyone. See *Booth*, 482 U. S., at 516 (WHITE, J., dissenting).

---

[2] Thus, it is entirely consistent with the Eighth Amendment principles underlying *Booth* and *South Carolina* v. *Gathers*, 490 U. S. 805 (1989), to authorize the death sentence for the assassination of the President or Vice President, see 18 U. S. C. §§ 1751, 1111, a Congressman, Cabinet official, Supreme Court Justice, or the head of an executive department, § 351, or the murder of a policeman on active duty, see Md. Ann. Code, Art. 27, § 413(d)(1) (1987). Such statutory provisions give the potential offender notice of the special consequences of his crime and ensure that the legislatively determined punishment will be applied consistently to all defendants.

These three scenarios, however, are fully consistent with the Eighth Amendment jurisprudence reflected in *Booth* and *Gathers* and do not demonstrate that harm to the victim may be considered by a capital sentencer in the ad hoc and post hoc manner authorized by today's majority. The majority's examples demonstrate only that harm to the victim may justify enhanced punishment if the harm is both foreseeable to the defendant and clearly identified in advance of the crime by the legislature as a class of harm that should in every case result in more severe punishment.

In each scenario, the defendants could reasonably foresee that their acts might result in loss of human life. In addition, in each, the decision that the defendants should be treated differently was made prior to the crime by the legislature, the decision of which is subject to scrutiny for basic rationality. Finally, in each scenario, every defendant who causes the well-defined harm of destroying a human life will be subject to the determination that his conduct should be punished more severely. The majority's scenarios therefore provide no support for its holding, which permits a jury to sentence a defendant to death because of harm to the victim and his family that the defendant could not foresee, which was not even identified until after the crime had been committed, and which may be deemed by the jury, without any rational explanation, to justify a death sentence in one case but not in another. Unlike the rule elucidated by the scenarios on which the majority relies, the majority's holding offends the Eighth Amendment because it permits the sentencer to rely on irrelevant evidence in an arbitrary and capricious manner.

The majority's argument that "the sentencing authority has always been free to consider a wide range of *relevant* material," *ante*, at 820–821 (emphasis added), thus cannot justify consideration of victim impact evidence that is *irrelevant* because it details harms that the defendant could not have foreseen. Nor does the majority's citation of *Gregg* v. *Geor-*

*gia* concerning the "wide scope of evidence and argument allowed at presentence hearings," 428 U. S., at 203 (joint opinion of Stewart, Powell, and STEVENS, JJ.), support today's holding. See *ante*, at 821. The *Gregg* joint opinion endorsed the sentencer's consideration of a wide range of evidence "[s]o long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant." 428 U. S., at 203–204. Irrelevant victim impact evidence that distracts the sentencer from the proper focus of sentencing and encourages reliance on emotion and other arbitrary factors necessarily prejudices the defendant.

The majority's apparent inability to understand this fact is highlighted by its misunderstanding of Justice Powell's argument in *Booth* that admission of victim impact evidence is undesirable because it risks shifting the focus of the sentencing hearing away from the defendant and the circumstances of the crime and creating a "'mini-trial' on the victim's character." 482 U. S., at 507. *Booth* found this risk insupportable not, as today's majority suggests, because it creates a "tactical" "dilemma" for the defendant, see *ante*, at 823, but because it allows the possibility that the jury will be so distracted by prejudicial and irrelevant considerations that it will base its life-or-death decision on whim or caprice. See 482 U. S., at 506–507.

## IV

The majority thus does far more than validate a State's judgment that "the jury should see 'a quick glimpse of the life petitioner chose to extinguish,' *Mills* v. *Maryland*, 486 U. S. 367, 397 (1988) (REHNQUIST, C. J., dissenting)." *Ante*, at 830–831 (O'CONNOR, J., concurring). Instead, it allows a jury to hold a defendant responsible for a whole array of harms that he could not foresee and for which he is therefore not blameworthy. JUSTICE SOUTER argues that these harms are sufficiently foreseeable to hold the defendant accountable because "[e]very defendant knows, if endowed with the mental competence for criminal responsibility, that

the life he will take by his homicidal behavior is that of a unique person, like himself, and that the person to be killed probably has close associates, 'survivors,' who will suffer harms and deprivations from the victim's death." *Ante*, at 838 (SOUTER, J., concurring). But every juror and trial judge knows this much as well. Evidence about who those survivors are and what harms and deprivations they have suffered is therefore not necessary to apprise the sentencer of any information that was actually foreseeable to the defendant. Its only function can be to "divert the jury's attention away from the defendant's background and record, and the circumstances of the crime." See *Booth*, 482 U. S., at 505.

Arguing in the alternative, JUSTICE SOUTER correctly points out that victim impact evidence will sometimes come to the attention of the jury during the guilt phase of the trial. *Ante*, at 840. He reasons that the ideal of basing sentencing determinations entirely on the moral culpability of the defendant is therefore unattainable unless a different jury is empaneled for the sentencing hearing. *Ante*, at 841. Thus, to justify overruling *Booth*, he assumes that the decision must otherwise be extended far beyond its actual holding.

JUSTICE SOUTER's assumption is entirely unwarranted. For as long as the contours of relevance at sentencing hearings have been limited to evidence concerning the character of the offense and the character of the offender, the law has also recognized that evidence that is admissible for a proper purpose may not be excluded because it is inadmissible for other purposes and may indirectly prejudice the jury. See 1 J. Wigmore, Evidence § 13 (P. Tillers rev. 1983). In the case before us today, much of what might be characterized as victim impact evidence was properly admitted during the guilt phase of the trial and, given the horrible character of this crime, may have been sufficient to justify the Tennessee Supreme Court's conclusion that the error was harmless because the jury would necessarily have imposed the death sentence even absent the error. The fact that a good deal of

such evidence is routinely and properly brought to the attention of the jury merely indicates that the rule of *Booth* may not affect the outcome of many cases.

In reaching our decision today, however, we should not be concerned with the cases in which victim impact evidence will not make a difference. We should be concerned instead with the cases in which it will make a difference. In those cases, defendants will be sentenced arbitrarily to death on the basis of evidence that would not otherwise be admissible because it is irrelevant to the defendants' moral culpability. The Constitution's proscription against the arbitrary imposition of the death penalty must necessarily proscribe the admission of evidence that serves no purpose other than to result in such arbitrary sentences.

V

The notion that the inability to produce an ideal system of justice in which every punishment is precisely married to the defendant's blameworthiness somehow justifies a rule that completely divorces some capital sentencing determinations from moral culpability is incomprehensible to me. Also incomprehensible is the argument that such a rule is required for the jury to take into account that each murder victim is a "unique" human being. See *ante*, at 823; *ante*, at 830–831 (O'CONNOR, J., concurring); *ante*, at 838 (SOUTER, J., concurring). The fact that each of us is unique is a proposition so obvious that it surely requires no evidentiary support. What is not obvious, however, is the way in which the character or reputation in one case may differ from that of other possible victims. Evidence offered to prove such differences can only be intended to identify some victims as more worthy of protection than others. Such proof risks decisions based on the same invidious motives as a prosecutor's decision to seek the death penalty if a victim is white but to accept a plea bargain if the victim is black. See *McCleskey* v. *Kemp*, 481 U. S. 279, 366 (1987) (STEVENS, J., dissenting).

Given the current popularity of capital punishment in a crime-ridden society, the political appeal of arguments that assume that increasing the severity of sentences is the best cure for the cancer of crime, and the political strength of the "victims' rights" movement, I recognize that today's decision will be greeted with enthusiasm by a large number of concerned and thoughtful citizens. The great tragedy of the decision, however, is the danger that the "hydraulic pressure" of public opinion that Justice Holmes once described[3]—and that properly influences the deliberations of democratic legislatures—has played a role not only in the Court's decision to hear this case,[4] and in its decision to reach the constitutional question without pausing to consider affirming on the basis of the Tennessee Supreme Court's rationale,[5] but even in its resolution of the constitutional issue involved. Today is a sad day for a great institution.

---

[3] *Northern Securities Co.* v. *United States,* 193 U. S. 197, 400–401 (1904) (Holmes, J., dissenting).

[4] See *Payne* v. *Tennessee,* 498 U. S. 1076 (1991) (STEVENS, J., dissenting).

[5] *Rust* v. *Sullivan,* 500 U. S. 173, 223 (1991) (O'CONNOR, J., dissenting).