JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant-appellant, Leonard Humphrey, appeals his conviction from the Cuyahoga County Court of Common Pleas. Finding no merit to this appeal, we affirm.
 {¶ 2} Humphrey and two co-defendants, Mark Peterson and Raynard Bishop, were arrested and charged for the murder of Frederick Smith, Jr. Humphrey was indicted with two counts of aggravated murder, with firearm specifications; two counts of aggravated robbery, with firearm specifications; and one count of having a weapon under disability. Peterson accepted a plea bargain in exchange for his testimony at the trials of Humphrey and Bishop. Humphrey and Bishop were tried separately.
 {¶ 3} At Humphrey's trial, the evidence revealed that in January 2006, Peterson and Bishop, who were close friends, were in the area of East 125th Street and Locke Avenue in Cleveland when they observed the victim with a large sum of money. Immediately, Bishop asked Peterson if he wanted to rob the victim. During this conversation, Bishop mentioned a possible gunman, "Lin-Lin" a.k.a. Leonard Humphrey, who could help with the robbery.
 {¶ 4} A few days later, Bishop introduced Humphrey to Peterson. That same day, Bishop sold Humphrey a black, nine-millimeter handgun. The three of them discussed the robbery. *Page 4 
 {¶ 5} On January 31, 2006, Peterson was at his sister's house at Eddy Road and Shadeland Avenue when he received a call from Bishop telling Peterson to meet him on Locke Avenue because Humphrey was going to rob the victim. Peterson met up with Bishop and Humphrey and sat on a porch six houses down from the victim's house and discussed the robbery.
 {¶ 6} Nafessa Salters, the victim's girlfriend, testified that she and the victim lived together at 487 East 127th Street, where the murder occurred. On the day of the murder, the victim and Salters ran errands together. On several occasions they returned home and observed Bishop on their front porch or in close proximity to their home. Salters testified that the victim had a large sum of money with him because they were shopping for furniture and a car.
 {¶ 7} Around 7:30 p.m., Salters and the victim returned home with their two children. While Salters was cooking dinner, the victim's cell phone began to ring. When Salters exited the home to tell the victim that his phone was ringing, she saw the victim standing on the sidewalk talking with Bishop.
 {¶ 8} The testimony revealed that Bishop was in charge of getting the victim outside and then pretending that he was being robbed, too. Peterson was to be the lookout. Humphrey was the gunman who was to rob the victim and Bishop.
 {¶ 9} According to Peterson, as he began to walk to the corner to act as the lookout, he heard two gunshots five or ten seconds apart. The gunfire also caught the attention of Antoinne Powell and Mimi Anderson, who lived across the street. *Page 5 
Powell looked out his third-floor attic window and saw the victim standing with his hands up, money on the ground, and a masked gunman, dressed all in black, pointing a gun at the victim. Powell observed the victim lunge for the fence while the gunman grabbed the money off the ground. Powell grabbed his cordless telephone, told Anderson that the victim was being robbed, and headed outside to help. When Powell was exiting the house, he saw the shooter and Peterson running toward Locke Avenue.
 {¶ 10} Anderson testified that she looked out the window and observed the victim going over the fence and the robber bending down and picking up something off the ground. Anderson left the window, grabbed her cell phone, and called Salters. When she returned to the window, she saw the gunman fire another shot and run toward Locke Avenue. Anderson also observed Peterson, who was at the corner, run off with the shooter.
 {¶ 11} Salters testified that at approximately 8:15 p.m., she received a call from Anderson asking if Frederick, the victim, was okay. Salters went outside and looked over the porch railing and did not see anything. She went back in the house and returned with a flashlight. She pointed the flashlight toward the area where she heard the victim's cell phone ringing and saw the victim lying on the ground.
 {¶ 12} Powell testified that he was on the phone with an operator from 911 who was directing him on how to perform CPR. Powell testified that the victim was *Page 6 
gasping for air and that there was blood all over his face. He could not perform CPR because there was too much blood coming from the victim's mouth.
 {¶ 13} Peterson testified that after he heard the gunshots, Humphrey ran toward him. Peterson asked Humphrey where the money was, and he replied "hold on." Peterson also asked Humphrey where he shot the victim, and Humphrey replied "in the leg." Humphrey gave Peterson $800 and they went their separate ways. Peterson then contacted Bishop, and they met on Eddy Road to divide up the money. By then, Bishop had heard that the victim died, and he told Peterson. The two returned to the scene of the crime.
 {¶ 14} Salters saw Bishop and told police that, according to neighbors, Bishop was seen running away from the scene with the shooter. In the meantime, Bishop approached Officer Timothy Combs and told him that he was also robbed but was able to run away before the victim was shot.
 {¶ 15} Detective Matlock testified that he received information that Peterson was also involved. Peterson and Bishop were taken to the homicide unit to be interviewed. Bishop originally gave a statement indicating that he was a victim; however, after being confronted by detectives, he partially confessed but minimized his role. Bishop and Peterson indicated that there was a third person involved and identified Humphrey in a photo array. Humphrey was subsequently arrested.
 {¶ 16} Deputy Coroner Frank Miller testified that he examined the victim and found two gunshot wounds, one to the head and the other to the lower left leg. Dr. *Page 7 
Miller testified that, according to his findings, the gun was very close to the victim's head when it was fired.
 {¶ 17} Inmate Darren Briscoe testified that he was housed in the same pod as Humphrey and that they had multiple conversations regarding the robbery/murder. Briscoe testified that Humphrey said he did not mean to shoot the victim. Briscoe also testified that Humphrey wrote him a letter asking Briscoe to fabricate a statement blaming the murder on Peterson. The letter was entered into evidence.
 {¶ 18} Humphrey was found guilty of aggravated murder under count two with a felony murder and firearm specification. He was also found guilty of two counts of aggravated robbery with a three-year firearm specification. Humphrey was found guilty by the court of having a weapon under disability.
 {¶ 19} During the penalty phase, the jury unanimously voted that Humphrey should serve thirty years to life. The court accepted the jury's recommendation and imposed an additional three years for the firearm specification; ten years for the two merged counts of aggravated robbery; and five years for the weapons under disability charge. All counts were to be served consecutive to one another, for an aggregate sentence of life imprisonment with parole eligibility after 48 years. Humphrey appeals, advancing seven assignments of error for our review. "I. The state failed to present sufficient evidence to sustain a conviction against appellant."
 {¶ 20} When an appellate court reviews a record upon a sufficiency challenge, "`the relevant inquiry is whether, after viewing the evidence in a light most favorable *Page 8 
to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'"State v. Leonard, 104 Ohio St.3d 54, 67, 2004-Ohio-6235, quotingState v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 21} Under this assignment of error, Humphrey argues that there is no credible evidence that he committed aggravated murder. Specifically, he argues that the co-defendants were not credible witnesses.
 {¶ 22} It is well established that an appellate court cannot evaluate the credibility of witnesses on a review for evidentiary sufficiency.State v. Yarbrough, 95 Ohio St.3d 227, 240, 2002-Ohio-2126,767 N.E.2d 216; see, also, State v. Murphy (2001), 91 Ohio St.3d 516, 543,2001-Ohio-112, 747 N.E.2d 765; State v. Waddy (1992), 63 Ohio St.3d 424,430, 588 N.E.2d 819; State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, paragraph one of the syllabus. The weight to be given the evidence and credibility of the witnesses are primarily for the trier of fact. State v. Thomas (1982), 70 Ohio St.2d 79, 79-80, 434 N.E.2d 1356. Furthermore, the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility. State v. Bezak,
Cuyahoga App. No. 84008, 2004-Ohio-6623. Thus, in reviewing the legal sufficiency of evidence to support a jury verdict, it is the minds of the jurors rather than a reviewing court that must be convinced.Thomas, supra, citing State v. Petro (1947), 148 Ohio St. 473, 501-502,76 N.E.2d 355; DeHass, supra. *Page 9 
 {¶ 23} At trial, Peterson, Humphrey's co-defendant, testified about the planning and execution of the robbery. Peterson implicated Humphrey as the gunman, which testimony was corroborated by two eye witnesses, as well as by Briscoe. Humphrey had confided to Briscoe that he shot the victim by accident. The detective testified that Humphrey's other co-defendant, Bishop, identified Humphrey as the gunman. Finally, the coroner testified that the gun was very close to the victim's head when it was fired, which is sufficient to prove Humphrey purposely caused the victim's death.
 {¶ 24} After viewing the evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the crimes proved beyond a reasonable doubt. Accordingly, Humphrey's first assignment of error is overruled.
 {¶ 25} "II. Appellant's convictions are against the manifest weight of the evidence."
 {¶ 26} In reviewing a claim challenging the manifest weight of the evidence, the question to be answered is whether "there is substantial evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt. In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way and created such a *Page 10 
manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Leonard, supra (internal quotes and citations omitted).
 {¶ 27} Under this assignment of error, Humphrey argues that there is no evidence of theft or that Humphrey had a gun. He argues the jury lost its way because they wanted to hold someone accountable.
 {¶ 28} We find that the jury did not lose its way. There is evidence in the record that the victim was carrying a large sum of money and that the victim was being robbed at gunpoint. The gunman, Humphrey, was seen picking money up off the ground. Further, Peterson testified that Humphrey gave him $800 cash immediately after the robbery.
 {¶ 29} As for the gun, all of the testimony was consistent. Bishop and Peterson were identified as being in the vicinity of the robbery during the robbery, but neither was seen with a gun. The gunman, Humphrey, wore a mask; Bishop and Peterson did not. Bishop had sold Humphrey a handgun. Two shell casings were found where the victim was robbed, and the victim had two gunshot wounds. Finally, Briscoe testified that Humphrey admitted that he shot the victim.
 {¶ 30} After examining the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we find that the jury did not lose its way and that the convictions were not against the manifest weight of the evidence. Accordingly, Humphrey's second assignment of error is overruled. *Page 11 
 {¶ 31} "III. The trial court erred by ordering appellant to serve a consecutive sentence without first considering a concurrent sentence and by making findings not supported by the record."
 {¶ 32} "IV. The trial court erred when it sentenced appellant to a maximum sentence without making the appropriate findings."
 {¶ 33} Under these two assignments of error, Humphrey argues that the court failed to consider concurrent sentences and failed to make the appropriate findings when it sentenced Humphrey to the maximum consecutive sentence available.
 {¶ 34} The Supreme Court of Ohio in State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856, found that judicial findings are unconstitutional and that several provisions of Senate Bill 2 are unconstitutional. Id. The court concluded that a trial court is no longer required to make findings or give its reasons for imposing maximum, consecutive, or more than the minimum sentences. Id. As a result, the trial court did not err when it did not make findings upon sentencing Humphrey to the maximum consecutive term.
 {¶ 35} Humphrey also argues that his sentence violates both his right to due process and the Ex Post Facto Clause of the United States Constitution.
 {¶ 36} In State v. Dyer, Cuyahoga App. No. 88202, 2007-Ohio-1704, this court addressed similar due process and ex post facto claims. Due process guarantees notice and a hearing; however, this court stated, "[b]ecause the right to a hearing has not been implicated byFoster, we are concerned only with notice given to the *Page 12 
defendant as to his potential sentence." Id. Here, Humphrey had notice that the sentencing range was the same at the time he committed the offenses as it was when he was sentenced. Therefore, Humphrey's due process rights have not been violated.
 {¶ 37} The Ex Post Facto Clause of Article I, Section 10 of the United States Constitution prohibits "every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." The United States Supreme Court placed similar restrictions on judicial opinions in Bouie v. Columbia (1964),378 U.S. 347. Dyer, supra.
 {¶ 38} A retroactive law is not necessarily unconstitutional if it is remedial. "Foster did not judicially increase the range of his sentence, nor did it retroactively apply a new statutory maximum to an earlier committed crime, nor did it create the possibility of consecutive sentences where none had existed." Id. See, also, State v.Mallette, Cuyahoga App. No. 87984, 2007-Ohio-715. As a result, we conclude that the remedial holding of Foster does not violate Humphrey's due process rights or the ex post facto principles contained therein.Accordingly, Humphrey's third and fourth assignments of error are overruled. "V. The trial court erred by ordering convictions for separate counts of aggravated murder and aggravated robbery to be served consecutively because the offenses are allied offenses pursuant to R.C.2941.25 and they are part of the same transaction under R.C. 2929.14." *Page 13 
 {¶ 39} In determining whether two separate charges constitute allied offenses of similar import, we must look to Ohio's multiple count statute, R.C. 2941.25, which provides as follows:
 "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 "(B) Where the defendant's conduct constitutes two or more similar offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."
 {¶ 40} The Supreme Court of Ohio analyzed this statute in State v.Rance (1999), 85 Ohio St.3d 632, 1999-Ohio-291, and held that in order to convict a criminal defendant on multiple charges, the offenses must either be (1) of dissimilar import or (2) if they are of similar import, committed separately or with a separate animus [intent]. Id. at 636. The test for determining whether two offenses are of similar import is whether the offenses "correspond to such a degree that the commission of one crime will result in the commission of the other." Id., citingState v. Jones, 78 Ohio St.3d 12, 13, 1997-Ohio-38. This test must be performed in the abstract, comparing the statutory elements of each offense while ignoring the facts of each particular case.Rance, supra, at 636. In State v. Coley, 93 Ohio St.3d 253,2001-Ohio-1340, the Supreme Court of Ohio reiterated that "aggravated murder is not an allied offense of similar import to an underlying aggravated *Page 14 
robbery" The Coley court cited to State v. Bickerstaff (1984),10 Ohio St.3d 62, 66, syllabus, in which the court specifically found "that aggravated murder, as defined in R.C. 2903.01, is not an allied offense of similar import to aggravated robbery, as defined in R.C. 2911.01, for purposes of R.C. 2941.25(A)." The court stated "[c]learly, the crimes and their elements do not correspond to such a degree that commission of one offense constitutes commission of the other, nor is the commission of one merely incidental to the other." Id.
 {¶ 41} Here, Humphrey was convicted of both aggravated murder and aggravated robbery. Since they are not allied offenses of similar import, the trial judge acted within the sentencing authority of R.C.2941.25(B) when the trial court sentenced Humphrey on the convictions for aggravated robbery and aggravated murder. Accordingly, Humphrey's fifth assignment of error is overruled.
 {¶ 42} "VI. The trial court erred by ordering convictions for separate counts of aggravated murder with a firearm specification and having a weapon while under disability to be served consecutively because the offenses are allied offenses pursuant to R.C. 2941.25 and they are part of the same transaction under R.C. 2929.14."
 {¶ 43} Under this assignment of error, Humphrey argues that having a weapon while under disability and a firearm specification are allied offenses of similar import and thus should merge at sentencing. "This exact argument has been considered and rejected by this Court."State v. Talley, Cuyahoga App. No. 87143, 2006-Ohio-5322, PGPage 15 citing, State v. Williams, Cuyahoga App. No. 81949, 2003-Ohio-3950; accord State v. Whittsette (Feb. 13, 1997), Cuyahoga App. No. 70091, citing State v. Blankenship (1995), 102 Ohio App.3d 534,547; see, also, State v. Whitmore (Dec. 14, 1989), Cuyahoga App. No. 56411. Accordingly, Humphrey's sixth assignment of error is overruled.
 {¶ 44} "VII. The trial court erred by allowing victim impact testimony during the penalty phase."
 {¶ 45} Under this assignment of error, Humphrey argues that the victim's mother should not have been permitted to testify during the penalty phase regarding the effect her son's death had on her and the victim's daughter. Humphrey argues that it was unduly prejudicial and that he is entitled to the minimum sentence as a result.
 {¶ 46} The United States Constitution does not prohibit victim-impact evidence in capital cases. State v. Noling, 98 Ohio St.3d 44, 67,2002-Ohio-7044, citing Payne v. Tennessee (1991), 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720. The Supreme Court of Ohio has held, however, that "expressions of opinion by a witness as to the appropriateness of a particular sentence in a capital case violate" a defendant's rights. Id., quoting, State v. Huertas (1990),51 Ohio St.3d 22, syllabus. The same principle applies to family representatives who express opinions about the penalty at sentencing hearings. See State v.Goodwin (1999), 84 Ohio St.3d 331, 343, 1999-Ohio-356; State v.Fautenberry (1995), 72 Ohio St.3d 435, 439. *Page 16 
 {¶ 47} Here, the remarks that Humphrey complains about do not require reversal. Not only did Humphrey fail to object to the remarks of the victim's mother, the mother did not recommend a sentence, nor did she give a lengthy, overly emotional statement to the jury. Further, the jury could have recommended the death penalty, but it did not. Finally, true victim-impact evidence, pursuant to the terms of R.C. 2930.13,2930.14 and 2947.051, shall be considered by the trial court prior to imposing sentence upon a defendant. Fautenberry, 72 Ohio St.3d at 440. Accordingly, Humphrey's seventh assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
CHRISTINE T. MCMONAGLE, J., CONCURS,
 MARY J. BOYLE, J., CONCURS IN JUDGMENT ONLY *Page 1