[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-10541

_____

D.C. Docket No. 1:13-cr-20339-JIC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RIGOBERTO CABRERA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 30, 2015)

Before ED CARNES, Chief Judge, MARTIN, Circuit Judge, and WALTER,[*]
District Judge.

_____

[*] Honorable Donald E. Walter, United States Senior District Judge for the Western
District of Louisiana, sitting by designation.

PER CURIAM:

Rigoberto Cabrera appeals his conviction and sentence for perpetrating an income tax fraud scheme.

## I.

The federal government discovered that Cabrera had masterminded an income tax fraud scheme that worked as follows. Cabrera and his associates would tell taxpayers they were entitled to tax refunds and offer to help the taxpayers get the refunds in exchange for a cut of the refund plus a fixed fee. Taxpayers who accepted the offer of services would give their names, W-2s, and other basic identifying information to Cabrera or his associates, who would electronically file the taxpayers' returns. The returns fraudulently claimed unfounded refunds based on Form 2439, an obscure IRS form that allows taxpayers a refund for taxes already paid on previously taxed "undistributed long term capital gains." The capital gains identified in the taxpayers' Form 2439s were falsely attributed to shell companies set up by Cabrera and his cohorts, who electronically filed substantially identical Form 2439s for dozens of people, including for Cabrera himself. In many cases, they used unsuspecting third parties' unsecured wireless networks to file the returns, so that it looked like the returns came from people unaffiliated with the scam.

2

As a result of the scheme, the IRS erroneously paid millions of dollars in undue refunds.  When the refunds arrived, Cabrera or an associate would coordinate with the taxpayers to collect Cabrera's share.  Cabrera arranged with Elias Obando to create new shell companies with bank accounts into which Cabrera's share of the refunds were deposited.  Thus laundered, the funds were then withdrawn and turned over to Cabrera.

A federal grand jury indicted Cabrera for conspiring to defraud the government by submitting false tax returns, making false, fictitious, or fraudulent claims on the government, conspiring to commit wire fraud, committing wire fraud, conspiring to launder money, and laundering money.  Cabrera's case was tried before a jury for five days.  On the first day, the government introduced spreadsheets generated by the IRS's electronic fraud detection system.  The spreadsheets catalogued certain information about electronically-filed returns, including the name on the return, the internet protocol (IP) address from which the return was filed, and the date the return was filed.  Although Cabrera objected on the ground that the IRS agent testifying about the spreadsheets was not sufficiently familiar with how they were generated, the district court overruled Cabrera's objection and admitted the spreadsheets into evidence.

The government presented dozens of witnesses and scores of exhibits tying Cabrera to the fraudulent returns and to attempts to launder the proceeds.  IRS

agents testified about the striking similarities between all of the other Form 2439s involved in the case and Cabrera's own fraudulent return. An IRS agent told the jury that Cabrera had amended his fraudulent return only after the IRS agent threatened him with prosecution, and that Cabrera nevertheless persisted in lying about amended return. Some taxpayers told the jury about meeting with Cabrera and agreeing to let him file their taxes in exchange for promises to pay a percentage of the refunds they received to companies controlled by Cabrera. The jury heard from Cabrera's associates who explained that he paid them to recruit taxpayers and that he either filed the fraudulent returns himself or instructed others how to file them. Obando told the jury that Cabrera had tasked him with setting up shell companies for use in laundering the proceeds from the scam. The government introduced bank records tracking the proceeds from the fraudulently obtained refunds — from taxpayers' bank accounts into the accounts of shell companies Cabrera ran, and then into Cabrera's bank account. An IRS computer expert even showed the jury that Cabrera's electronic fingerprints were all over the documents used in the scam. And on and on. The government's case was thorough and compelling.

Near the end of its case-in-chief, the government called IRS agent Karyn Calabrese to testify about the nature and scope of Cabrera's scam. After Calabrese noted that some of the fraudulent returns had been submitted from Marcelle

4

Boardman's unsecured residential IP address, the government asked if she had been able to link Boardman's IP address to any other returns. Calabrese responded: "I think there were an additional 27 tax returns that we didn't present here," at which point Cabrera's counsel objected and asked for a sidebar. At the sidebar, Cabrera's counsel argued that the reference to the additional 27 returns involved "uncharged crimes" and information that had not been disclosed before trial. The district court overruled the objection and denied Cabrera's counsel's motion for a mistrial. The court then asked Cabrera's counsel if he wanted a curative instruction, to which Cabrera's counsel replied "Okay[,] [t]hat is satisfactory." The court promptly instructed the jury that Cabrera was "only on trial for those crimes charged in the indictment and nothing more," and the government continued examining Calabrese.

Later in Calabrese's testimony, the government asked if Carlos Mara's tax return — which was not among the returns for which the government charged Cabrera — was among those reflected in the spreadsheets. Cabrera's counsel objected and moved to strike, again arguing that the government was seeking to introduce evidence of uncharged crimes about which there had been no discovery. The court overruled Cabrera's objection and allowed the testimony because Calabrese was addressing returns that "were all filed during the period of time that the conspiracy has been alleged in the indictment." Calabrese proceeded to answer

5

the government's question, explaining that Mara's return had been filed from an IP address associated with Cabrera and one of his shell companies, and that Mara's return was filed just a few weeks before Mara sent a sizable payment to that shell company.

At the close of the government's case-in-chief and again at the close of all evidence, Cabrera moved for judgment of acquittal under Federal Rule of Criminal Procedure 29. The district court denied both motions. The jury found Cabrera guilty on all counts.

## II.

The presentence investigation report calculated Cabrera's guidelines range by grouping together all closely related counts, as required by U.S.S.G. § 3D1.2. Because the counts involving fraud were closely related to one another and the counts involving money laundering were closely related to one another, the PSR bundled those counts into two groups. The PSR then grouped all the fraud counts with all the money laundering counts because Cabrera's money laundering convictions all involved funds from the fraud.

To calculate Cabrera's base offense level, the PSR, consistent with § 3D1.3(a), applied the guidelines section addressing the most serious of the grouped offenses. The most serious of the grouped offenses was money laundering, which is covered by § 2S1.1. Under § 2S1.1(a)(1), the base offense

level for Cabrera's money laundering conviction was the total offense level for the fraud from which the laundered funds derived. To calculate the total offense level for the fraud convictions, the PSR applied an enhancement under § 2B1.1(b)(10)(C) to account for the fact that the fraud involved "sophisticated means."

The PSR ultimately calculated that the total offense level for the fraud convictions was 29, meaning that under § 2S1.1(a)(1) the base offense level for the money laundering convictions was 29. To that base offense level, the PSR added levels to account for the specific characteristics of Cabrera's money laundering offenses, including two levels under § 2S1.1(b)(3) because the money laundering involved sophisticated means.

Cabrera objected that the PSR failed to group the fraud and money laundering accounts, exposing him to "impermissible double counting." He argued that the PSR improperly penalized him twice — once under § 2B1.1(b)(10)(C) of the guidelines and once under § 2S1.1(b)(3) of the guidelines — for the fact that his scheme had been sophisticated.

An addendum to the PSR responded that the guidelines required grouping the counts together as it had. In particular, the addendum explained that the enhancements for sophisticated means in the fraud and sophisticated laundering accounted for different aspects of the scheme. The sophisticated means

7

enhancement took into account the fact that Cabrera had used fictitious entities and shell corporations to attempt to conceal the fraud itself and his role in it. The sophisticated laundering enhancement was based on Cabrera's use of intermediaries and different shell corporations both to hide the origin of the funds from the fraud and to obscure his involvement in the cover-up.

Responding to the addendum, Cabrera reasserted his objection and argued that the rule of lenity required the court to interpret ambiguities in the guidelines' grouping requirements and sophistication enhancements in the ways most favorable to him. He maintained his objections to the PSR at sentencing, but the district court overruled them, finding by a preponderance of the evidence that both sophistication enhancements — one for fraud and the other for laundering — should apply. The district court adopted the PSR's guidelines calculations, concluding that Cabrera's guidelines range was 292–365 months. After rejecting Cabrera's request for a downward variance, the district court imposed a bottom of the guidelines range sentence of 292 months, plus $1,526,622 in restitution. Cabrera timely appealed his conviction and sentence. He challenges the sufficiency of the evidence against him, the admission of Calabrese's statements about so-called "uncharged false returns," and the district court's guidelines calculations.

## III.

We reject Cabrera's challenge to the sufficiency of the evidence against him. We will reverse a conviction on sufficiency grounds only if the defendant shows that "there is no reasonable construction of the evidence from which the jury could have found the defendant[] guilty beyond a reasonable doubt." United States v. Joseph, 709 F.3d 1082, 1093 (11th Cir. 2013). Cabrera has not made that showing for any of the charged counts. For example, he argues that there was no proof of his role in any of the conspiracies. But Obando testified at length that Cabrera was the impresario behind the fraud and the money laundering operation. Cabrera's clients told the jury how he had convinced them to let him prepare their taxes. Lissette Nunez, one of Cabrera's former employees, told the jury that the people involved in the fraud schemes "did the work for Rigo," and he paid them for it. And FBI Agent Neville Barrant testified that documents integral to the scam bore identification markers linking them to Cabrera. The jury could reasonably credit any or all of that testimony and rely on it to find beyond a reasonable doubt that Cabrera was instrumental in perpetrating the fraud. His sufficiency challenges on other bases are similarly belied by even the most cursory inspection of the record.

## IV.

Cabrera's argument that Calabrese's testimony about "uncharged false returns" violated his Fifth Amendment right to a fair trial is also meritless. The

9

admission of evidence at trial violates due process only if "it renders the trial fundamentally unfair." Payne v. Tennessee, 501 U.S. 808, 825, 111 S. Ct. 2597, 2608 (1991). Calabrese's passing references to uncharged returns did not render Cabrera's trial fundamentally unfair because, among other things, she simply referred to information in the spreadsheets already before the jury. Calabrese did not testify about the contents of the uncharged returns or even that the returns were fraudulent. She merely pointed out geographic, technological, and temporal links between the charged returns and other returns on the spreadsheets — links that were already discernible from the spreadsheets themselves. In fact, Calabrese acknowledged, on the stand, that her testimony "simply [was] that [a private, unsecured] IP address of internet service was used to send other electronically filed returns and those [returns] are depicted in [the IRS spreadsheets, exhibits] 69 and 70." Calabrese's challenged testimony also could not have lent credibility to the IRS spreadsheets themselves because she did not testify about the reliability of the data on the spreadsheets. She testified only that the spreadsheets showed that certain people's tax returns had been filed from certain IP addresses at certain times. Because the testimony did not introduce the jury to new facts or address the credibility of facts already in evidence, it cannot rationally be said to have unfairly prejudiced Cabrera, let alone to have made his trial fundamentally unfair. See Carter v. United States, 362 F.2d 257, 259 (5th Cir. 1966).

10

## V.

Nor did the government violate Cabrera's due process rights by failing to produce the uncharged returns in advance of Calabrese's testimony. She did not testify about the contents of the returns; she merely highlighted what the spreadsheets already showed, which was that certain returns had been filed from certain IP addresses at certain times. Discovery of the contents of the underlying returns thus would not have helped Cabrera refute Calabrese's testimony, meaning that the government's failure to permit discovery of the returns did not render his trial fundamentally unfair.

The Federal Rules of Evidence also did not require the district court to exclude the challenged parts of Calabrese's testimony. Cabrera suggests that Calabrese's testimony violated Rule 404(b), which prohibits the use of evidence of a prior bad act to prove a person's bad character. Fed. R. Evid. 404(b)(1). The government did not offer any of Calabrese's testimony to prove Cabrera's bad character; it offered the testimony as evidence of Cabrera's method for filing returns and as evidence of the scope of his tax fraud scheme. Rule 404(b)(2) makes clear that "prior bad act" evidence may be used for those purposes.

Cabrera points out that Calabrese's testimony must still clear the bar set by Rule 403. But Rule 403 "is an extraordinary remedy which should be used sparingly, since it permits the trial court to exclude concededly probative

11

evidence." United States v. Church, 955 F.2d 688, 700 (11th Cir. 1992). District courts, moreover, have "considerable discretion" to admit or exclude evidence under Rule 403. Lambert v. Fulton Cty., Ga., 253 F.3d 588, 596 (11th Cir. 2001). Because Calabrese's challenged testimony was relevant to the scope and nature of the charged conspiracies, and because any prejudicial effect from the testimony was negligible — since the testimony merely highlighted information already in the spreadsheets — the district court did not abuse its discretion in admitting Calabrese's testimony over Cabrera's Rule 403 objection.

## VI.

That leaves Cabrera's arguments that the district court miscalculated his guidelines range. He contends first that the PSR failed to group the fraud and money laundering counts as required by U.S.S.G. § 3D1.2. But the PSR did group the fraud and money laundering counts together, just as Cabrera says it should have. In explaining the steps behind its calculations, the PSR states that: "The [fraud] counts are subsequently grouped together with the money laundering counts under § 3D1.2(c), pursuant to § 2S1.1, comment. (n. 6), since [Cabrera] is convicted of laundering funds and the underlying offense from which the laundered funds were derived." Cabrera got exactly the type of grouping to which he says he was entitled.

12

Cabrera's other guidelines argument is that the district court engaged in impermissible double counting when, in calculating his guidelines range, it applied a two-level enhancement because the fraud involved sophisticated means and then another two-level enhancement because the money laundering was also sophisticated. According to Cabrera, the "sophisticated" conduct accounted for in each enhancement is the same, so that applying the enhancements together punishes him twice for the same harm. That argument misconceives the nature of the harm addressed by each enhancement. The sophisticated means enhancement in § 2B1.1(b)(10)(C) of the guidelines is directed at the fraud itself and applies when the fraudulent scheme, in its totality, is especially complex or intricate. See U.S.S.G. § 2B1.1, cmt. 9(B); United States v. Barrington, 648 F.3d 1178, 1199 (11th Cir. 2011). This enhancement applied to Cabrera's underlying crime, which involved filing fraudulent returns using an obscure tax form, routing those forms through stolen IP addresses, and stashing the proceeds in fake companies. The sophisticated laundering enhancement in § 2S1.1(b)(3), by contrast, covers the harm from laundering the proceeds of the fraud. See U.S.S.G. § 2S1.1, cmt. 5(A). This enhancement addresses the sophistication of the money laundering Cabrera undertook with Obando's help, not the scheme from which the funds were derived. Because the two enhancements recognize and punish different harms from fundamentally different conduct, application of both enhancements is not

13

"impermissible double counting," which "occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." United States v. Dudley, 463 F.3d 1221, 1226–27 (11th Cir. 2006).

Also, we "presume that the Commission intended to apply separate guideline sections cumulatively unless [we are] specifically directed otherwise." United States v. Stevenson, 68 F.3d 1292, 1294 (11th Cir. 1995). The guidelines do not forbid applying the sophisticated means and sophisticated laundering enhancements together. Instead, they expressly contemplate that the enhancements may be applied cumulatively so long as the conduct that is the basis for applying the sophisticated laundering enhancement is not the only conduct that is the basis for applying the sophisticated means enhancement. U.S.S.G. § 2S1.1(b)(3) & cmt. 5(B). The conduct — layering and the use of certain shell corporations — that is the basis for applying the sophisticated laundering enhancement to Cabrera is not the same as the conduct — including the use of an obscure IRS form and a different set of shell corporations — that is the basis for applying the sophisticated means enhancement to him. On these facts, the district court did not err in applying both enhancements.

Cabrera invites us to construe the guidelines in light of the rule of lenity, but that rule has no role in this case. It applies only if the provision being construed is

14

ambiguous after application of normal rules of statutory construction. United States v. Camacho-Ibarquen, 410 F.3d 1307, 1315 (11th Cir. 2005). There is no ambiguity about how the guidelines apply here.

For the first time in his reply brief, Cabrera raises two more arguments: (1) that the district court should have applied the guideline for wire fraud, not money laundering, to calculate his guidelines range; and (2) that the district court erred in finding that his money laundering activities were sophisticated. Because he raised neither argument in his opening brief, both arguments are forfeited. See United States v. Noriega, 676 F.3d 1252, 1260 n.2 (11th Cir. 2012).

**AFFIRMED.**

15